# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERIC MUELLER; CORISSA D.
MUELLER, husband and wife
individually and on behalf of
Taige L. Mueller, a minor, and on
behalf of themselves and those
similarly situated,
                    *Plaintiffs-Appellees,*

                    v.

APRIL K. AUKER; BARBARA
HARMON; JANET A. FLETCHER;
KIMBERLY A. OSADCHUK; LINDA
RODENBAUGH; KARL B. KURTZ; KEN
DIEBERT; CITY OF BOISE,
                    *Defendants,*

TED SNYDER; TIM GREEN; RICHARD
K. MACDONALD; SAINT LUKE'S
REGIONAL MEDICAL CENTER, LTD.,
                    *Defendants,*

                    and

DALE ROGERS,
                    *Defendant-Appellant.*

No. 07-35554

D.C. No.
CV-04-00399-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
September 15, 2008—Moscow, Idaho

Filed August 10, 2009

10791

Before: J. Clifford Wallace, Stephen S. Trott, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Trott;
Partial Concurrence and Partial Dissent by Judge Wallace

**COUNSEL**

Michael E. Rosman, Center for Individual Rights, Washington, D.C., for the plaintiffs-appellees.

Kirtlan G. Naylor, Naylor & Hales, P.C., Boise, Idaho, for the defendant-appellant.

**OPINION**

TROTT, Circuit Judge:

Detective Dale Rogers made a decision permitted by Idaho law to remove temporarily a sick infant from the custody of her parents in order to secure a medical diagnostic test and prophylactic treatment, procedures which pediatric doctors advised Rogers were both necessary and within the standard of care for the infant's situation. At the time, the child had been taken to St. Luke's hospital in Boise, Idaho, by her mother, while her father, Eric Mueller, remained at home to care for the couple's other child. Detective Rogers intervened at the behest of hospital doctors after the child's mother, Corissa Mueller, refused to consent to the recommended procedures. Eric Mueller was not given pre-deprivation notice of the detective's intentions or post-deprivation notice by Detective Rogers, and the Muellers's child received a medical test and treatment in Eric Mueller's absence.

Eric Mueller sued Detective Rogers, claiming that he was deprived of (1) his substantive due process rights, and also (2) his individual procedural due process rights to both pre- and post-deprivation notice in connection with the detective's decision. Corissa Mueller's causes of action are not part of this appeal.

As a defense, Detective Rogers timely asserted qualified immunity. The district court (1) ruled with respect to both

parties' competing motions for summary judgment on the Muellers's substantive due process claims that a genuine issue of material fact existed as to whether the child was in imminent danger when Detective Rogers made his decision, (2) granted nonetheless Rogers's request for qualified immunity on those substantive due process claims, (3) denied Rogers's request for qualified immunity on Eric Mueller's procedural due process claims, and (4) granted summary judgment to Eric Mueller on his procedural due process claims on the ground that Rogers's failure timely to notify him both before and immediately after the deprivation of custody violated his constitutional rights as a matter of law.

In this appeal, Rogers asks us (1) to reverse the district court's grant of summary judgment in favor of Eric Mueller's procedural pre-deprivation and post-deprivation notice due process claims, and (2) to rule in his favor on those claims on the ground of qualified immunity.

We have jurisdiction over this timely appeal, and we conclude (1) that the district court erred in granting summary judgment to Eric Mueller on his procedural due process claims as a matter of law, and (2) that Detective Rogers is shielded by qualified immunity from those same claims. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

# I

## BACKGROUND

The facts that accompany this appeal are largely undisputed. They are as follows.

On August 12, 2002, Corissa Mueller's five-week-old infant, Taige Mueller, developed a fever. Throughout the course of the evening, Corissa Mueller consulted with the child's naturopathic physician, Dr. Karen Erickson, via tele-

phone. Mother and physician grew concerned when the child's fever rose from roughly 99 degrees at 8:00 p.m. to 100.8 degrees by around 9:00 p.m. In light of Taige's age, elevated temperature, and poor appetite, Dr. Erickson recommended that Corissa Mueller have the infant examined to rule out such conditions as an ear infection, a urinary tract infection, or possibly meningitis. Dr. Erickson, who had no hospital privileges, informed Corissa Mueller that, if she took Taige to an emergency room, doctors would likely want to conduct a chest x-ray, urinalysis, and blood tests as well as "automatically" begin an antibiotic regimen and perform a spinal tap, which is a diagnostic test used to determine if a patient has meningitis.

Corissa Mueller discussed the possibility of a spinal tap and the administration of antibiotics with her husband, Eric Mueller. The Muellers believed they would have the authority to withhold consent or at least obtain a second opinion if an emergency room doctor suggested a course of treatment with which they were uncomfortable. In response to Corissa Mueller's expression of concern regarding a spinal tap and administration of antibiotics, Dr. Erickson suggested that, should the situation arise, Corissa Mueller could consent to a chest x-ray, urinalysis, and blood tests right away, but wait until the results of these initial tests were returned before consenting to the spinal tap and antibiotics. In his deposition, Eric Mueller explained that he and his wife weighed their options and determined that taking Taige to the emergency room "would be the safe thing to do."

At around 10:00 p.m., while Eric Mueller remained at home with the couple's young son, Corissa Mueller took Taige to the emergency room at St. Luke's Hospital in Boise, Idaho. Upon admitting Taige, Corissa Mueller provided the hospital with her husband's name, stated that he was Taige's father, and gave the hospital the address and telephone number where she and her husband lived. In her deposition, Corissa Mueller explained that she remained in telephone

contact with Dr. Erickson and called her "a handful of times" throughout the night.

In the emergency room, Dr. Richard MacDonald examined the infant, observing that she had a temperature of 101.3, appeared ill, and was slightly lethargic and fussy with a delayed capillary refill and a slight rash. Concerned Taige may have meningitis or another serious bacterial infection, Dr. MacDonald recommended Taige undergo a full septic work-up, including various lab tests and a spinal tap and begin an antibiotic regimen. Dr. MacDonald emphasized that time was of the essence to perform the spinal tap and administer antibiotics because "these babies can go from bad to worse very quickly."

Despite Dr. MacDonald's warning that there was a five percent chance Taige had contracted meningitis, Corissa Mueller, though not a medical professional, believed through her own research that the risk was likely less than one percent. She further believed the risks associated with administering antibiotics and performing a spinal tap outweighed the probability that Taige had meningitis. Although Corissa Mueller consented to the performance of a chest x-ray and to the blood work, urinalysis, and stool sample, she withheld consent for the spinal tap and antibiotics, expressing her preference to "wait until the initial lab results got back, or at least until . . . [Taige] got worse . . . . "

At around 11:00 p.m. the results of Taige's lab tests became available. The results ruled out a urinary tract infection and ear infection, but no test had been administered which could rule out meningitis. Corissa Mueller understood the only way to rule out meningitis was to perform a spinal tap. By that time, Taige had received intravenous fluids, her temperature had fallen to 98.9 degrees, and she began to nurse again. Corissa Mueller could find no reason to consent to further treatment. She rejected Dr. MacDonald's offer to obtain a second medical opinion. Without consulting her husband,

she denied permission to the doctors to take any further diagnostic steps.

In response to Corissa Mueller's refusal to consent to the recommended procedures, Dr. MacDonald consulted with board-certified pediatrician Dr. Noreen Womack, who agreed that for five-week-old infants with Taige's symptoms the standard of care was to perform a spinal tap and administer antibiotics. Dr. Womack recommended that Dr. MacDonald contact a social worker if Corissa Mueller continued to withhold her consent. Dr. MacDonald contacted hospital social worker Bob Condon. Citing the hospital's policy regarding the duties of a social worker, Condon decided to contact both Child Protective Services (CPS), a division of the Idaho Department of Health and Welfare, and law enforcement. Though the policy upon which Condon relied did not forbid contacting a magistrate judge, neither did it require it. At 11:39 p.m., Condon called April Auker, the on-call Risk Assessment Worker for CPS. Also, Condon contacted police officers Ted Snyder and Tim Green, who were present in the hospital.

At around 12:00 a.m. on August 13, Auker arrived at the hospital emergency room. Dr. MacDonald spoke with Auker, Officer Snyder, and Officer Green about Taige Mueller's condition. A transcript of the conversation recorded on Officer Snyder's belt recorder reveals Dr. MacDonald explaining:

> [I]f I took a hundred kids with the same presentation probably 95 percent of them would end up having just some viral illness; will get better in a couple of days; would be fine. I know that about 5 out of those 100 if I let them go home will die. Will die of meningitis . . . if I practice medicine the way she [Corissa Mueller] is wanting me to practice it, I would . . . I'd lose five out of a hundred kids. See what I'm saying?

Dr. MacDonald explained to Auker that it was important that Taige Mueller be treated within a three-hour time frame.

Following the conversation with Dr. MacDonald, Officer Snyder contacted the police station, and Detective Dale Rogers was dispatched to the scene. Detective Rogers arrived in the emergency room at approximately 1:00 a.m. Officer Snyder briefed Detective Rogers on the situation. Under former Idaho Code § 16-1612, Detective Rogers as a "peace officer" had the responsibility to determine whether an endangered child should be placed in "shelter care" under temporary control of the State pending a court hearing.

Detective Rogers then spoke with Dr. MacDonald. Dr. MacDonald informed Detective Rogers that "[t]here could be a three to five percent chance this child could have a serious bacterial infection; meningitis or sepsis" and that treatment should begin "as soon as possible to prevent deleterious outcome such as death or brain damage." Dr. MacDonald further explained that "[a]s many as 5 out of 100 kids, if they had meningitis and went home untreated, could potentially die." Also, Dr. MacDonald assured Detective Rogers that any risk associated with treatment was less than the risk associated with foregoing treatment. Dr. MacDonald added that "he had a three-hour window of opportunity, and that we were already into that window of opportunity by over two hours, two hours and 15 minutes, and we needed to make a decision."

Detective Rogers considered declaring Taige in "imminent danger" to allow Dr. MacDonald to perform the recommended procedures. Under former I.C. § 16-1612, when a law officer declared a child in imminent danger and turned the child over to the State Department of Health and Welfare, the State assumed custody of that child, and could consent to medical treatment. Detective Rogers spoke with April Auker and asked whether Child Protective Services was prepared to take custody of Taige and, if it did, whether it would consent to the treatment Dr. MacDonald was suggesting. April Auker replied that CPS was prepared to take custody, and would consent to the treatment.

Dr. MacDonald introduced Detective Rogers to Corissa Mueller. On three different occasions, Detective Rogers spoke with Corissa Mueller about Dr. MacDonald's desire to perform the spinal tap and administer antibiotics. Each time Detective Rogers attempted to convince Corissa Mueller to consent to the treatment, and each time Corissa Mueller refused to consent, without consulting her husband. On at least one occasion, Detective Rogers mentioned the possibility of declaring Taige in imminent danger and explained that if he did so, the procedures could be performed without Corissa Mueller's consent. In response, Corissa Mueller recalled "asking him point-blank, are you going to do that? Because if you are, then I have two phone calls I want to make." However, Detective Rogers did not directly respond.

After her third conversation with Detective Rogers, Corissa Mueller requested a nurse take Taige's temperature again and told the nurse that if her child's temperature was still down, she wanted to begin discharge procedures. Around this time, Corissa Mueller called her husband Eric to inform him that "Taige was doing better and that she was going to check out." At no time did Corissa Mueller ask that anyone consult with her husband.

Corissa Mueller did not return home with Taige. Instead, at around 1:40 a.m., a reexamination revealed Taige's temperature had risen to 101 degrees. Upon learning this, Corissa Mueller stepped from the examining room into the hall toward the phone with the intention of calling Dr. Erickson. However, Detective Rogers intervened and informed her based upon Taige's downturn that he was declaring the child in imminent danger and turning custody of her over to the State. This decision had the immediate effect of placing Taige in shelter care, i.e., temporary foster care.

Fearful, Corissa Mueller turned back toward the examining table and her baby, but was halted by Officers Snyder and Green and Detective Rogers. With a police officer at each

side, an emotional Corissa Mueller was physically escorted down the hallway to a small conference room. According to Officer Snyder, she was "screaming and yelling" and resisting their requests. Officers Snyder and Green remained in the room with Corissa Mueller. Officer Snyder refused to allow Corissa Mueller to make any phone calls, despite her plea to call her husband. Officer Snyder told her she could use the telephone after she had talked with Detective Rogers. The officers's intent was to maintain order in the hospital and to prevent any interruption of patient care. Their conduct is not an issue in this appeal.

Soon thereafter, Detective Rogers entered the room and presented Corissa Mueller with written notice of a post-deprivation hearing in state court. April Auker from CPS tried once again to secure her consent to the recommended procedures, but she refused. Detective Rogers told her that before he would allow her to use the phone she had to get herself "under control." At around 3:00 a.m., Officers Snyder and Green escorted Corissa Mueller to the hospital lobby and directed her to a telephone, which she used to call her husband. Eric Mueller recalls his wife "hysterically crying that they had taken our baby."

Meanwhile, Auker secured consent through her supervisor Barbara Hamon from Linda Rodenbach, the State's Program Director, authorizing Auker to permit Dr. MacDonald to treat Taige. This included Auker's written and signed consent on behalf of Child Protective Services to perform a spinal tap, and what Dr. MacDonald recalls as a verbal consent to treat the infant in whatever method he deemed appropriate. At approximately 3:00 a.m., Dr. MacDonald performed the spinal tap and authorized the administration of antibiotics and steroids to Taige. After calling her husband, Corissa Mueller attempted to enter the exam room where Dr. MacDonald was treating Taige, but was once again escorted away. The spinal tap showed that Taige's spinal fluid was clear, indicating that

meningitis was not present. Any possible medical emergency was over.

Sometime later that morning, after Taige's treatment, Corissa Mueller was reunited with her daughter, and Eric Mueller arrived at the hospital. On August 14, 2002, at a statutory post-deprivation hearing called by the Ada County, Idaho, Prosecuting Attorney, the Muellers regained custody of Taige. As the state district court noted: "The evidence shows that Corissa and Eric Mueller are loving parents who at all times had the best interests of Taige in mind. There is absolutely no evidence of abuse or neglect, and no allegation that either parent was in any way unfit."

On August 4, 2004, the Muellers filed a Complaint in United States District Court for the District of Idaho seeking relief for the events of August 12 and August 13, 2002. The Muellers filed a Second Amended Complaint on April 27, 2006, alleging claims against Detective Rogers for violation of their substantive and procedural constitutional rights pursuant to 42 U.S.C. § 1983. The Muellers filed a Motion for Summary Judgment along with a statement of undisputed facts and supporting affidavits on April 20, 2006 and May 2, 2006.

Detective Rogers denied all claims against him in the Second Amended Complaint. He filed a motion for summary judgment against the Muellers, and included supporting affidavits, on May 15, 2006.

The district court heard arguments on the motions. On February 26, 2007, the court granted partial summary judgment to Detective Rogers on the ground that he was shielded by qualified immunity against the Muellers's claims that proceeding as he did violated their substantive due process parental rights. Notwithstanding questions of fact as to whether Rogers (1) had time to contact a judge, and (2) was confronted with a child in imminent danger, the court concluded

(1) that "no clearly established law existed" to guide him under these circumstances, and (2) that his decision and conduct were reasonable "in light of the specific context of the case . . . ."

On Eric Mueller's claims of a violation of his procedural due process rights to pre- and post-deprivation notice, however, the court held that these rights were both clearly established and violated on the facts as a matter of law, and thus not only denied qualified immunity to Detective Rogers, but finally and conclusively granted summary judgment to Eric Mueller on the merits.[1] Detective Rogers thereafter timely filed a Motion for Reconsideration.

On June 7, 2007, the district court entered an order denying Detective Rogers's Motion for Reconsideration. Pursuant to Rule 4 of the Federal Rules of Appellate Procedure, Detective Rogers timely filed a Notice of Appeal.

---

[1]In its analysis, and in its response to Eric Mueller's motion for summary judgment on the merits with respect to his claims of violations of his constitutional rights, the court said that it would (1) identify first the core constitutional rights at issue, (2) then determine "whether those rights were violated (or whether questions of fact remain)," and then turned to the issue of qualified immunity.

We note that summary judgment with respect to the first prong of the test for qualified immunity under *Saucier v. Katz*, 533 U.S. 194, 206 (2001), on one hand, and summary judgment on the merits of whether an officer actually violated a plaintiff's rights, on the other, are quite different. It does not follow that a denial of summary judgment to an officer on *Saucier*'s first prong of qualified immunity — looking at the facts favorably to the plaintiff — necessarily determines that the plaintiff must prevail at summary judgment on this issue on the merits of the claim — looking at the facts favorably to the officer. The difference is subtle, but exquisitely important.

## II

## JURISDICTION

### A.  *Mitchell v. Forsyth*

Ordinarily, we have jurisdiction only over "final decisions" of the district court. 28 U.S.C. § 1291. However, the Supreme Court has in effect created an exception to this rule for matters involving claims by a public official of qualified immunity from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 525-30 (1985). This exception whereby non-final decisions become "final orders" for the purpose of § 1291 stems from the policy-driven nature and substance of the defense of qualified immunity, which is more than a "mere defense to liability," but is actually a complete *immunity from suit*, and from all the risks, distractions and "inhibitions of discretionary action, and deterrence of able people from public service," that go along with being a defendant in a civil lawsuit. *Id.* at 526 (emphasis in original). Recognizing that this unique entitlement to avoid court altogether is "effectively lost if a case is erroneously permitted to go to trial, the Court held in *Mitchell* that a district court's "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Id.* at 530.

The Court in *Mitchell* also addressed the appealability of a defendant's failed motion for summary judgment on the ground of qualified immunity, holding that both the denial of a defendant's motion as well as a ruling by the trial judge that "if the facts are as asserted by the plaintiff, the defendant is not immune" qualify for the purposes of § 1291 as "final orders." *Id.* at 527.

The three attributes of such an immediately appealable "final order" are (1) "they 'finally determine claims of right [such as qualified immunity] separable from, and collateral to,

rights asserted in the action' "; (2) are " 'too important to be denied review' "; and (3) are " 'too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.' " *Ashcroft v. Iqbal*, 556 U.S. ___ (2009) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996); quoting in turn *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949)).

It is useful in understanding the scope and limits of *Mitchell*'s jurisdictional holding to examine the posture of Mitchell's case before the Supreme Court. In response to cross-motions for summary judgment — such as we have here — the district court "found that there was no genuine dispute as to the facts," and that Mitchell's conduct as alleged "was a clear violation of the Fourth Amendment . . . ." *Id.* at 515. However, the district court ruled that Mitchell could prevail on the ground of qualified immunity if he had acted "in good faith," and thus denied both parties' motions for summary judgment on this isolated issue. Then the plot thickened.

On remand from the Third Circuit Court of Appeals, the district court reconsidered its previous ruling on qualified immunity in light of *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), in which the Court "purged qualified immunity doctrine of its subjective components." *Mitchell*, 472 U.S. at 517. Nevertheless, the district court denied again Mitchell's motion for summary judgment *and* "granted Forsyth's motion for summary judgment on the issue of liability, and scheduled further proceedings on the issue of damages." *Id.* The Court of Appeals then held with respect to the district court's order that it was not appealable under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). *Forsyth v. Kleindienst*, 729 F.2d 267 (3d Cir. 1984).

Significantly, the Supreme Court granted certiorari to examine *inter alia* (1) "the issue of the appealability before final judgment of orders denying [qualified] immunity", and (2) "the District Court's decision — left standing by the Court

of Appeals — that Mitchell's actions violated clearly estab-
lished law . . . ." *Mitchell*, 472 U.S. at 519.

After concluding that matters involving denials of qualified
immunity were immediately appealable, the Court then turned
to the issue *not* addressed by the Court of Appeals, i.e., the
district court's summary judgment holding that Mitchell's
actions violated clearly established law, which the court
regarded as "appropriate for our immediate resolution."

Finally, the Supreme Court held that the Court of Appeals
erred in declining to accept jurisdiction over the question of
qualified immunity, and it reversed that court's merits deci-
sion that Mitchell was not entitled to qualified immunity.

## B.    Qualified Immunity: Jurisdictional Considerations

The interest protected by the qualified immunity doctrine is
so singularly and sufficiently important that it justifies more
than one pretrial appeal by a defendant asserting the same. In
*Behrens v. Pelletier*, 516 U.S. 299 (1996), the Supreme Court
opened our jurisdictional door to pretrial appeals in the same
case from first, a failed motion by a defendant to dismiss, and
then, a failed motion for summary judgment. In so doing, the
Court waived aside the concerns that would ordinarily limit to
one the number of pretrial appeals available to a defendant,
such as costs, delays, waste of appellate court time, litigation
coherence etc. *Id.* at 308-13. Not one of these worries is
implicated in accepting a pretrial appeal or district court's
grant of summary judgment to Eric Mueller on the merits. In
fact, the contrary is true. By reviewing it now, we efficiently
eliminate the possible need to review it later. An answer now
to the propriety of the denial of summary judgment will allow
both sides better to assess the status of their case, and not
cause Rogers to appeal later on to cleanse the record and his
name. The collateral personal and professional consequences
for an officer of the law to have on his record a pending judg-
ment such as this — even though uncollectable — are mani-

fest. A lawyer, for example, might well find his interest in becoming a judge foreclosed. One needs only to watch federal judicial confirmation hearings in the United States Senate to appreciate this reality.

Furthermore, we have in mind the Supreme Court's admonition in *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (*per curiam*) "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."

Finally, the erroneous judgment our colleague would leave standing has the potential to function as precedent in the district of Idaho; yet another reason to examine it now.

## C. Analysis

**[1]** "[D]etermining whether there is a genuine issue of material fact at summary judgment is a question of law . . . ." *Ashcroft v. Iqbal*, 556 U.S. ___ (2009). However, because it is a "legal question that sits near the law-fact divide," *id.* the Supreme Court held in *Johnson v. Jones*, 515 U.S. 304 (1995) that a *denial* of qualified immunity defense on the ground that there was a genuine issue of material fact yet to be decided deprived that denial of the attributes of an immediately appealable final order. Underlying the Court's decision was a recognition that the *denial* of a motion for summary judgment on the ground of the existence of genuine issues of material facts does not conclusively and finally determine the claim of right involved. In fact, such a ruling leaves the issue yet to be decided. Our colleague in dissent has written an excellent disquisition on appellate jurisdiction in this context. He relies in large measure on *Johnson* to support his views. However, because *Johnson* involved a *denial* of a defendant's motion, and our case involves a *grant* of summary judgment to a plaintiff resisting the same, we believe *Johnson* to be distinguishable.

**[2]** Thus, recognizing that we plow new ground because of the unusual posture of Rogers's situation, we conclude that the grant of summary judgment to Eric Mueller as a matter of law on the merits of a constitutional claim, and against a defendant asserting qualified immunity, is the equivalent of a denial of such an assertion. Such denial where the district court has held that no cognizable factual disputes exist vests us with jurisdiction under the collateral order doctrine.

There can be no doubt that the district court's order at issue finally and conclusively determined all liability issues against Rogers. To hold otherwise would be not only unwisely to exalt form over substance, but to ignore the fact that, according to the Supreme Court, it is the *substance* of the entitlement not to stand trial that demands the exception from the usual rule. The proof of the pudding once again is in the eating, and here the result is unpalatable when measured against the entitlement under consideration. Here, not only did the district court's summary judgment in favor of Eric Mueller conclusively and finally decide the issue of liability and impose the continuing burdens of litigation on Rogers, but it effectively foreclosed his potential entitlement not to stand trial on damages and left outstanding a judgment against him that he violated Eric Mueller's constitutional rights. Such a result — if wrong — would simply "deny[ ] justice by delay." *Eisen v. Charlisle and Jacquelin*, 417 U.S. 156, 171 (1974) (quoting *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511 (1950)).

In effect, the denial in this case and the grant on the merits, even though it was not "independent of the cause itself," *Iqbal*, 556 U.S. at ___, are "inextricably intertwined," opening the door to the doctrine of "pendent Jurisdiction." *See Swint v. Chambers County Commission*, 514 U.S. 35 (1995).[2]

---

[2]Our colleague dismisses this discussion by the Supreme Court as "dicta." Dicta it may be, but it suggests that the Supreme Court and the law on the subject may be open to this principle. We believe it fits the facts and legal circumstances of this case, so we use it.

As we held in *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1376 (9th Cir. 1990),

> Likewise, [Officer] Aguilar may appeal the district court's grant of summary judgment in favor of the [plaintiffs] Durans on the issue of section 1983 liability. The legal issues involved in that appeal-whether Aguilar violated clearly established constitutional protections — are identical to those governing the question of Aguilar's qualified immunity. As the relevant facts are not disputed, the resolution of the qualified immunity question will also decide the question of Aguilar's liability. Delaying our consideration of the liability issue until after the trial on damages would thus serve no purpose.

We draw support for our decision from the Sixth Circuit. In *Brennan v. Township of Northville*, 78 F.3d 1152 (6th Cir. 1996), our sister circuit confronted on interlocutory appeal a district court's denial of qualified immunity to two police officers. As in our case, the district court had also granted partial summary judgment to the plaintiff on liability. After ruling in favor of the officers on qualified immunity, the circuit court reached out and disposed of the rest of the case. Their convincing analysis — rendered in the "interest of judicial economy" — was as follows:

> We would not normally have jurisdiction over the rest of the case-the summary judgment in favor of Brennan-because a partial summary judgment on the issue of liability alone is not a "final decision" under 28 U.S.C. § 1291. This case presents a special situation, however, in which the issues of liability and qualified immunity are so related to each other that we can dispose of them together under the doctrine of pendent appellate jurisdiction. We do so, reversing plaintiff's summary judgment against the two police officers.

Our discretionary exercise of pendent appellate jurisdiction in this case is consistent with that of other courts of appeals, which have interpreted dictum in *Swint v. Chambers County Comm'n.*, as allowing pendent appellate jurisdiction where the appealable and non-appealable issues are "inextricably intertwined." *See Moore v. Wynnewood*, 57 F.3d 924, 928-31 (10th Cir. 1995) . . . . In a carefully reasoned opinion, the Tenth Circuit [in *Moore*] determined that because the plaintiff had failed to show a constitutional violation in his § 1983 action, not only should the police officer defendant prevail on qualified immunity grounds, but also the city defendant should prevail on its normally unappealable interlocutory claim. *Moore*, 57 F.3d at 927, 929-30. The two claims were "inextricably intertwined" because the finding of nonexistence of a constitutional claim for immunity purposes necessarily decided the whole case not only in favor of the officer, but also in favor of the city as well.

. . .

The situation in *Moore* closely mirrors our own. In the instant case, our reversal of the district court's qualified immunity determination on the ground that Brennan has not alleged a constitutional violation is indisputably "coterminous with, or subsumed in" the second issue: whether Brennan is entitled to summary judgment on the basis of a constitutional violation. Our finding on the first issue necessarily and unavoidably decides the second. Because we find that Brennan's rights were not violated for immunity purposes, we must find that Brennan's rights were not violated for purposes of obtaining affirmative relief.

(citations omitted). *See also Dolihite v. Maughon*, 74 F.3d 1027, 1035 n. 3 (11th Cir. 1996) (exercising pendent jurisdic-

tion over issues "inextricably intertwined" with core qualified immunity issues); *Kincade v. City of Blue Springs*, 64 F.3d 389, 394-95 (8th Cir. 1995), *cert. denied*, 517 U.S. 1166 (1996) (exercising appellate jurisdiction over closely related issues of law, i.e., pending appellate claims); *Kaluczky v. City of White Plains*, 57 F.3d 202, 206-07 (2d Cir. 1995) ("[T]he [Supreme] Court [in *Swint*] did not otherwise narrow the scope of pendent jurisdiction, and appeared to contemplate pendent appellate jurisdiction over an independent but related question that is 'inextricably intertwined' with the issue of qualified immunity or is 'necessary to ensure meaningful review' of that issue.").

A holding that Rogers must wait to appeal the adverse ruling about him not only makes no sense, but it flies right in the face of efficient judicial administration. It is not a satisfactory answer in the context of qualified immunity to tell Rogers that the judgment stands, but that it is uncollectible, and if he finds this unsatisfactory, he can appeal later.

## III

## STANDARD OF REVIEW

This court reviews de novo a district court's denial of summary judgment on the basis of qualified immunity. *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007). "The grant of 'partial' summary judgment is also reviewed de novo." *Delta Savings Bank v. U.S.*, 265 F.3d 1017, 1021 (9th Cir. 2001). This court "may not affirm a grant of summary judgment if there is any genuine issue of material fact or the district court incorrectly applied the substantive law." *Id.* With respect to Eric Mueller's motion for summary judgment against Rogers, we must view the evidence "in the light most favorable" to Rogers as the non-moving party to determine if there was no genuine issue as to any material fact and that Mueller was entitled to judgment as a matter of law. *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1064 (9th Cir. 2002)

(en banc) (quoting *Delta Savings Bank*, 265 F.3d at 1021);
Fed. R. Civ. Pro. 56(c). All justifiable inferences are to be
drawn in favor of Rogers, and his evidence is to be believed.
*Blankenhorn*, 485 F.3d at 470. With respect to Rogers's
motion for summary judgment on Mueller's procedural due
process claims, we review the evidence in the light most
favorable to the Muellers.

## IV

## DISCUSSION

### A.  Eric Mueller's Motion for Summary Judgment Against Rogers

**[3]** The first question we must answer is whether the dis-
trict court erred in granting summary judgment to Eric Muel-
ler on the merits of his procedural due process pre-deprivation
notice claim. We cannot affirm a grant of summary judgment
if a genuine issue of material fact exists. *Delta*, 265 F.3d at
1021. Whether a child is in imminent danger when she is
removed from her parents' custody is a material fact, because
it is unlawful to take a child into state custody without notice
and a hearing *unless* that child is in imminent danger. *See
Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997). Because
we conclude after reviewing the evidence on this issue in the
light most favorable to Rogers that there was a genuine issue
of material fact as to whether Rogers was confronted with
imminent danger to Taige at the time in question, we reverse
the district court's ruling.

**[4]** As the historical facts clearly indicate, qualified medical
doctors told Rogers (1) that there was a 5% chance that Taige
had a "serious bacterial infection; meningitis or sepsis," (2)
that she was potentially in danger of dying, (3) that they had
only 45 minutes to act to save her, (4) that the risk of treat-
ment was less than the risk of foregoing treatment, (5) that if
Taige left the hospital without treatment, "she could become

increasingly ill and die before Mrs. Mueller could return to the hospital," and (6) Eric Mueller was not there, having delegated the care of his daughter to Corissa. Corissa was uncooperative and becoming hysterical. She had to be removed from the area by police officers. Rogers considered calling Eric but decided against it because:

> Corissa Mueller was quite adamant in her refusal, and I believe Taige was running out of time to receive needed treatment and did not want to waste valuable time by having Eric or Corissa argue over Dr. MacDonald's recommendations. Furthermore, I was concerned that even if Eric Mueller consented and Corissa did not, that I would be faced with a tug-of-war with Corissa to enforce Eric Mueller's treatment decision.

Moreover, the hospital's social worker opined that "even if . . . he had provided consent, we had Corissa in the hospital not providing consent. We would have had to follow her wishes. She was there. She was holding the child."

**[5]** This set of facts and circumstances creates without doubt a classic genuine issue of material fact on the central issue of whether Rogers reasonably perceived imminent danger to Taige. *See Ram v. Rubin*, 118 F.3d at 1310 ("taking Ram's children into custody without notice and a hearing was unlawful unless there was imminent danger to the children"). In this respect, our conclusion is fully consistent with the district court's denial of the Muellers's substantive due process right-to-a-judicial-hearing-claim on the ground that "[t]hese circumstances create issues of fact over whether Detective Rogers had sufficient time to call a judge." Having so concluded, we move to the next issue: whether Rogers is entitled to qualified immunity on Mueller's notice claims.

## B.    Qualified Immunity

### 1.    The Doctrine

Qualified immunity shields public officials from civil damages for performance of discretionary functions. It is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526. Under qualified immunity, an officer will be protected from suit when he or she "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also Saucier*, 533 U.S. at 206 (2001). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The standard is an objective one that leaves "ample room for mistaken judgments." *Id.* at 343. Moreover, the court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. at 227.

The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties. The Supreme Court has reminded us to recognize the demands of the real world in evaluating acts by members of the executive branch of government:

> Nor is it always fair, or sound policy, to demand official compliance with statute and regulation on pain of money damages. Such officials as police officers or prison wardens, to say nothing of higher level executives . . . who enjoy only qualified immunity, routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them. These officials are subject to a plethora of

rules, "often so voluminous, ambiguous, and contra-dictory, and in such flux that officials can only com-ply with or enforce them selectively." See P. Schuck, Suing Government 66 (1983). In these circum-stances, officials should not err always on the side of caution. "[O]fficials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office."

*Davis v. Scherer*, 468 U.S. 183, 196 (1984) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 246 (1974)).

## 2. Analytical Methodology

To determine whether a public official is protected by qual-ified immunity, the Supreme Court required until recently that we first consider whether the official's conduct violated a constitutional right, and if so, then whether that right was clearly established at the time of the event in question. *Saucier*, 533 U.S. at 201. Only after deciding the first step were we authorized to go to the second step. Under the second step, to attach liability "[t]he contours of the right must be suffi-ciently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This framework means that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly estab-lished." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). In other words, the second-step question in this case is, was the law such that it should have been clear to Detective Rogers that he was required *in the situation he confronted* to give pre-deprivation and post-deprivation notice to an absent father. *See id.*

## 3. *Pearson v. Callahan* Discretion

In *Pearson v. Callahan*, 129 S. Ct. 808, 555 U.S. \_\_\_\_ (2009), the Court abandoned *Saucier*'s rigid two-step protocol

as an inflexible mandate, concluding that, "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Pearson*, 129 S. Ct. at 818. The court further held that the "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

As guidance to us with respect to deciding in a given case whether a constitutional decision on *Saucier*'s first prong is appropriate, the Court said,

> Although the first prong of the *Saucier* procedure is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development. For one thing, there are cases in which the constitutional question is so fact-bound that the decision provides little guidance for future cases.

*Pearson*, 129 S. Ct. at 819. The Court added that the law elaboration purpose is not well served where the constitutional inquiry "involves a . . . question which is highly idiosyncratic and heavily dependent on the facts." *Id.* (quoting *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006)).

The Court held, therefore, that a court may proceed to the second prong of the Saucier analysis without addressing the first, where "a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." *Pearson*, 129 S. Ct. at 820.[3]

---

[3]At our request, both parties have supplied us with their views as to the application of *Pearson* to this case. We thank them for their input.

### 4.   *Saucier*'s First Prong

**[6]** The first question normally is whether on this record it is appropriate to render a decision on *Saucier*'s first prong with respect to Eric Mueller's procedural due process pre-deprivation notice claim and whether such a violation occurred. Because we have concluded after reviewing the factual evidence on this issue in the light most favorable to Rogers — or for that matter to Eric Mueller — that there was a genuine issue of material fact as to whether Rogers was confronted with imminent danger to Taige at the time in question, we see no useful purpose in pursuing this fact-bound inquiry.

**[7]** With all respect to the district court's conclusion to the contrary, this kaleidoscopic set of facts and circumstances creates without doubt a classic genuine issue of material fact on the central issue of whether Rogers reasonably perceived imminent danger to Taige. *Ram v. Rubin*, 118 F.3d at 1310 ("taking Ram's children into custody without notice and a hearing was unlawful unless there was imminent danger to the children."). Thus, if a factfinder were to decide that Rogers was indeed confronted with exigent circumstances, his failure to contact Eric would not have violated Eric's rights. On the other hand, a factual decision to the contrary would produce an opposite constitutional result. This case, therefore, presents the type of situation as contemplated by the Supreme Court where a constitutional decision is inappropriate and unwise. "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 631 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Thus we proceed to the next prong.

### 5.   *Saucier*'s Second Prong

**[8]** This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Sau-*

*cier*, 533 U.S. at 201. *See also Brosseau*, 543 U.S. at 198. Thus, viewing here the facts in the light most favorable to the Muellers, and assuming without deciding that Eric Mueller in the circumstances presented, had constitutional rights to both pre- and post-deprivation notice which were not honored, we determine whether those rights were clearly established. Specifically, was it clearly established that Detective Rogers had to give pre-deprivation notice not only to the parent in the hospital present with and exercising judgment with respect to her child's medical situation, but also to a parent absent from the scene of his decision? Further, was it clearly established that Eric Mueller had a constitutional right to post-deprivation notice, which Detective Rogers had the responsibility to deliver?

## C.    Analysis

### 1.    Pre-Deprivation Notice

**[9]** Parents generally have a procedural right to a judicial hearing if the State seeks to compel their minor child to undergo a medical treatment over their objection. *See Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000). This right, however, is not absolute. As previously explained, when the State has "reasonable cause to believe that the child is in imminent danger of serious bodily injury and . . . the scope of the intrusion is reasonably necessary to avert that specific injury," a State has the authority without prior judicial authorization to compel a minor child to undergo specific medical treatment over parental objections. *Wallis*, 202 F.3d at 1138. We have said also that the taking by officials of endangered children into custody may be accomplished "without notice." *Ram*, 118 F.3d at 1310.

In ruling that Eric Mueller was entitled to summary judgment on the claim that Detective Rogers violated his constitutional right to pre-deprivation notice, and that Detective

Rogers was not entitled to qualified immunity, the district court relied upon our holding in *Wallis* to conclude that both parents are unconditionally entitled to pre-deprivation notice. We respectfully disagree with the district court's conclusion that *Wallis* stands clearly for the constitutional proposition that *both* parents necessarily have a clearly established right to pre-deprivation notice.

First, the facts and circumstances in *Wallis* are not only different, but manifestly distinguishable from those in the instant case. In *Wallis*, police officers received a tip from an institutionalized and previously discredited mental patient with a long history of delusional disorders that her brother, Wallis, intended to sacrifice his son to Satan on the full moon. 202 F.3d at 1131. Without a court order, the officers seized the child and his sister from their home and the custody of their parents, and placed them in a county-run institution. *Id.* at 1134. We stated:

> Three days after the children were removed from their home, Detective Pitcher picked them up from the county institution and took them to Palomar Hospital, where she ordered, on behalf of the Escondido Police Department, an evidentiary physical examination of both children. No court order was obtained prior to this examination, which was performed in order to determine whether either child had been sexually abused. Nor were the parents notified in advance that the examinations would be conducted. They were not given any opportunity to object to the intrusive examinations, to suggest conditions under which they might take place, or to be present when they occurred.

*Id.* at 1134-35. The children were not returned to their parents for approximately two and one-half months. *Id.* at 1131. In reversing the grant of summary judgment to the city, we held the state's failure to provide notice to a child's parents prior

to such physical examinations, undertaken solely for an investigative purpose, violates the parents' procedural due process rights. *Id.* at 1141.

**[10]** However, neither *Wallis* nor any of the authorities upon which it relies clearly establish a constitutional rule that *both* parents must be given pre-deprivation notice before medical intervention in the context and setting of our present case. In *Wallis*, neither parent was given any notice whatsoever of the decision by the police to subject the children to investigatory exams. Consequently, the question of whether notice to one parent and not to the other would or would not suffice to satisfy procedural due process was not present in that case. It simply was not an issue.

**[11]** In contrast to *Wallis*, *both* Muellers made the decision voluntarily to have their child taken by the child's mother to a hospital for medical evaluation. Both parents knew from the child's own naturopathic physician that it was probable that the hospital doctors would resort to the administration of antibiotics and a spinal tap to evaluate the precise medical situation which occasioned their concern. Understandably and appropriately, Eric Mueller chose to stay at home and entrust the medical care of his daughter to his wife. It was eminently reasonable for Detective Rogers to believe that Corissa Mueller was speaking for her husband. Moreover, unlike what happened to Mrs. Wallis or her husband, Taige's mother was fully notified and aware of the doctors's and the detective's concerns, her input and reservations were solicited and evaluated before any decision was made, and she was permitted to be in "a waiting room or other nearby area" while the medical procedures were being undertaken. *Id.* at 1142.

This context is a far cry from what happened to the Wallis family. *Wallis* was about protecting children from parents' possible criminal behavior, not treating a sick child taken to a hospital by her mother. The references to "parents" in *Wallis* must be viewed in this light, and it is not clear from that

opinion that an absent parent in an intact family such as Eric Mueller, must at all times be notified of what is about to happen to his child where the child's other parent is present with the child.

When asked at oral argument for counsel's best authority that it was clearly established at the time Detective Rogers declared Taige in imminent danger that both parents needed to be notified, the answer was "footnote 14 in *Wallis*." Footnote 14 reads as follows:

> We note that the claims of each family member must be assessed separately. Here, nothing in the record before us suggests that Becky Wallis was anything other than a fit and loving mother. As the Third Circuit recently held, a state has no interest whatever in protecting children from parents unless it has some reasonable evidence that the parent is unfit and the child is in imminent danger. The government may not, consistent with the Constitution, interpose itself between a fit parent and her children simply because of the conduct — real or imagined — of the other parent.

*Id.* at 1142 n.14. (internal citation omitted). This footnote does no more than address the government's contention that because the *Wallis* children's father was a suspected danger to the children, their mother did not have a substantive due process right to be present. Footnote 14 falls far short of creating a clearly established right of both parents to pre-deprivation notice in a setting presented by the case before us on appeal. There is nothing in *Wallis* that would give Detective Rogers fair notice either that in this context he had to call an absent parent, or that failing to do so was constitutionally unlawful.

**[12]** During oral argument, counsel for Eric Mueller was asked about the consequences of Eric Mueller's possible tele-

phonic consent over his wife's objections to the disputed pro-
cedures. Ironically, his answer was, "[o]ne parent is all that is
needed to go ahead over the other's objection." If this is true,
a peace officer in Detective Rogers's situation could ratio-
nally assume that talking to the one parent present would also
suffice. There is no practical purpose in seeking consent from
Eric Mueller when Corissa Mueller had already objected and
would need to be restrained regardless of whether Eric Muel-
ler consented. Furthermore, had Corissa Mueller consented,
there would have been no need to notify or to consult her hus-
band.

## 2.    Post-Deprivation Notice

**[13]** The Muellers further assert, and the district court
ruled, that Detective Rogers violated Eric Mueller's constitu-
tional procedural due process right to post-deprivation notice.
This court has recognized "that a parent may have a cogniza-
ble due process right to a post-deprivation hearing when the
state removes a child from the parent's custody on an emer-
gency basis and places the child with an individual who does
not enjoy legal custody." *Caldwell v. LeFaver*, 928 F.2d 331,
334 (9th Cir. 1991). *See also Campbell v. Burt*, 141 F.3d 927,
929 (9th Cir. 1998). To accord with procedural due process,
parents must be given notice of a post-deprivation hearing.
*See Campbell*, 141 F.3d at 929; *Caldwell*, 928 F.2d at 334.

**[14]** In this case, Detective Rogers gave Corissa Mueller
explicit notice of his decision to transfer custody of Taige to
the State. He did so prior to the medical procedures in ques-
tion. He then gave her written notice of the post-deprivation
hearing sometime between 1:40 a.m. and 3:00 a.m. on August
13, 2002. The written notice included details about the hear-
ing date, time, and location. Around 3:00 a.m. Idaho Depart-
ment of Health and Welfare employee Barbara Hamon called
Eric Mueller at his home. Hamon informed Eric Mueller that
Taige had been declared in imminent danger, why his daugh-
ter had been declared in imminent danger, that Taige would

remain at the hospital for further care, and that a court hearing would take place. Both husband and wife attended the hearing the next day.

**[15]** The Muellers contend that the notice given by Detective Rogers to Corissa Mueller was insufficient to satisfy Eric Mueller's right to post-deprivation notice. For the reasons given earlier in this Opinion, we disagree. Moreover, the precise question here is not whether Eric Mueller was entitled to post-deprivation notice of the pending hearing, but whether the Constitution clearly mandated that Detective Rogers be the one to deliver such notice. We answer this question in the negative. Detective Rogers had a central role in this matter, but one that was confined to making the decision that would transfer temporary custody of Taige to the State. At the point he made that decision, the State took over in the person of April Auker from Child Protective Services. From that moment, Detective Rogers had no say whatsoever in what would happen to Taige. All medical and custodial decisions were to be made by April Auker and doctors at St. Luke's Hospital, and eventually the state court, as the district court recognized:

> When an officer finds imminent danger, and invokes Idaho Code § 16-1612, the officer turns the child over to the State Department of Health and Welfare. The State has the duty to "secure adequate care" for the child, *see* I.C. § 16-1601, and thus is authorized to consent to medical treatment for the child.

If any agency had the constitutional responsibility to give post-deprivation notice to Eric Mueller regarding treatment or what the State had in store for Taige, it was the Idaho Department of Health and Welfare and Child Protective Services, not Detective Rogers, the peace officer.

**[16]** In any event, the Idaho Department of Health and Welfare — which assumed temporary custody over Taige —

did timely provide Eric Mueller with post-deprivation notice. It is an uncontested fact that Barbara Hamon advised Eric Mueller "around 3:00 a.m.," on August 13, 2002, (1) that Taige had been taken into shelter care, (2) of the reason for that decision, (3) that Taige would remain in the care of the Department of Health and Welfare, and that "a shelter care hearing would be taking place to determine whether Taige would remain in the care of the Department or be returned to the care of her parents."

[17] Any state, of course, is free by statute or otherwise to mandate a different approach to these issues. *See* I.C. § 16-1613 (2001) (requiring post-deprivation notice by the responsible peace officer to "each of the parents."). As a general rule, however, "a violation of state law does not lead to liability under § 1983." *Campbell*, 141 F.3d at 930. *See also Davis v. Scherer*, 468 U.S. at 194 n.12 (stating officials may lose immunity only if a statute or regulation provides the basis for the right). Here, the controlling state laws regarding notice did not clearly establish a federal right on the night in question. *Campbell*, 141 F.3d 930 (noting the doctrine is limited to a certain core of prisoners' rights). Thus, while Eric Mueller did have a constitutionally protected procedural due process right to post-deprivation notice, this right was satisfied.

To reiterate, it has not been clearly established that a peace officer in this complex context would have understood that it was his constitutional responsibility personally to advise Eric Mueller post-deprivation of the situation with his daughter. Unlike the facts and particulars in *Wallis*, here Detective Rogers was no longer in the decision making process once CPS — a different agency — assumed responsibility for Taige. All medical decisions were to be made by CPS. In *Wallis*, it was the detective in charge of the investigation of possible abuse who, without a court order, picked the children up from the county institution where they were housed and took them to a hospital where she ordered an evidentiary physical examination of both children. *Wallis*, 202 F.3d at 1134-35. Time was

not of the essence, the children were not sick, and doctors were not breathing down the necks of the police with concerns about their mortality. It comes as no surprise that under those circumstances, we held that police exercising control over the children and making decisions regarding their medical and physical situation, were required by the Constitution to give notice to the parents, as well as to seek judicial approval of their plan. *Id.* at 1141. Eric Mueller has not demonstrated that either *Wallis* or any other precedent makes it apparent in light of pre-existing law that Detective Rogers's non-involvement in the post-deprivation notice to Eric Mueller was unlawful.

## V

## POSTSCRIPT

There was a time in our legal history when this analysis would have been different, a regrettable time when married women like Corissa Mueller literally had no rights of their own. Nowhere was this made more clear than in the Supreme Court's decision in 1872 denying Myra Bradwell's request to overturn the Supreme Court of Illinois's refusal — on the ground that she was a woman — to allow her to practice law. *Bradwell v. The People of the State of Illinois*, 83 U.S. 130 (1872). The Supreme Court of Illinois said, "[t]hat God designed the sexes to occupy different spheres of action, and that it belonged to men to make, apply, and execute the laws, was regarded as an almost axiomatic truth." *In re Bradwell*, 55 Ill. 535, 1896 WL 5503 at *3 (Ill. 1869).

The United States Supreme Court decision treated Myra Bradwell no better, ruling against her and upholding Illinois's judgment. In a concurring opinion, Justice Bradley articulated the commonly held dogma of the day:

> [T]he civil law, as well as nature herself, has always recognized a wide difference in the respective

spheres and destinies of man and woman. Man is, or
should be, woman's protector and defender. The nat-
ural and proper timidity and delicacy which belongs
to the female sex evidently unfits it for many of the
occupations of civil life. The constitution of the fam-
ily organization, which is founded in the divine ordi-
nance, as well as in the nature of things, indicates the
domestic sphere as that which properly belongs to
the domain and functions of womanhood. The har-
mony, not to say identity, of interest and views
which belong, or should belong, to the family institu-
tion is repugnant to the idea of a woman adopting a
distinct and independent career from that of her hus-
band. So firmly fixed was this sentiment in the
founders of the common law that it became a maxim
of that system of jurisprudence that a woman had no
legal existence separate from her husband, who was
regarded as her head and representative in the social
state; and, notwithstanding some recent modifica-
tions of this civil status, many of the special rules of
law flowing from and dependent upon this cardinal
principle still exist in full force in most States. One
of these is, that a married woman is incapable, with-
out her husband's consent, of making contracts
which shall be binding on her or him. This very inca-
pacity was one circumstance which the Supreme
Court of Illinois deemed important in rendering a
married woman incompetent fully to perform the
duties and trusts that belong to the office of an attor-
ney and counsellor [sic].

It is true that many women are unmarried and not
affected by any of the duties, complications, and
incapacities arising out of the married state, but these
are exceptions to the general rule. The paramount
destiny and mission of woman are to fulfil the noble
and benign offices of wife and mother. This is the
law of the Creator. And the rules of civil society

> must be adapted to the general constitution of things, and cannot be based upon exceptional cases.

*Bradwell v. The People of the State of Illinois*, 83 U.S. 130, 141-42 (1872). *See also Minor v. Happersett*, 88 U.S. 162 (1874) (confining the right to vote to men).

Fortunately, we emerged long ago from Justice Bradley's legal dark ages. The transition was slow, culminating finally in *Reed v. Reed*, 404 U.S. 71 (1971), which embraced women within the Fourteenth Amendment's guarantee of equal protection of the laws. Finally, the law had shed its pretense of "romantic paternalism," which put women "not on a pedestal, but in a cage." *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973).

**[18]** Thus, the right of an absent parent to pre-deprivation notice in this context was not clearly established when Detective Rogers declared Taige in imminent danger and placed her in state custody. Therefore, Detective Rogers is entitled to qualified immunity on the claim he violated Eric Mueller's due process right to pre-deprivation notice.

## VI

## CONCLUSION

This case illustrates the wisdom of the doctrine of qualified immunity. On one hand, we find loving, caring, and concerned parents doing their best to make considered and appropriate decisions for their sick infant daughter. On the other, we find qualified doctors doing their best to provide the proper medical care for the child, who very well might have been in dire and deadly circumstances. An understandable irreconcilable difference of opinion arose between mother and doctor, which Idaho law expected a peace officer promptly to navigate and to resolve. One side would prevail, in which case the other could not.

There is not a scintilla of evidence in this record to suggest that Detective Rogers made his decision for any reason other than his informed perception of the best welfare of both the mother and the child. Idaho's Child Protective Act specifies that "[a]t all times the health and safety of the child shall be the primary concern," while preserving "the privacy and unity of the family whenever possible." I.C. § 16-1601 (2001). Detective Rogers, the person in the middle, took concrete steps to accommodate both interests.

No one is surprised that Corissa Mueller and her husband have taken umbrage at the State's decision to override their parental concerns. For them, this was a terrible and distressing event. But, to render Detective Rogers accountable in this lawsuit for a difficult discretionary decision would only deter other officers similarly situated in the future from making any decision at all, a situation which would be unacceptable and which is precisely what qualified immunity is designed to avoid. In no way can Detective Rogers be said to have been either "plainly incompetent," to have acted in bad faith, or to have "knowingly violate[d] the law." *Malley*, 475 U.S. at 34l.

Our conclusion regrettably will come as no consolation to the Mueller family, but it is required by law based upon the need to allow government officials to make reasonable decisions, even when the concerns driving those decisions turn out — happily in this case — to be unsubstantiated. Fortunately for all concerned, Taige has emerged from this episode in good health.

Detective Rogers has successfully shown he is entitled to qualified immunity on the claim that he violated Eric Mueller's constitutional right to pre-deprivation notice. It was not clearly established at the time that he removed Taige from her parents' custody that he was required to give Eric Mueller notice of his decision. Thus, we reverse both the district court's denial of summary judgment on Rogers's claim and the district court's grant of summary judgment to Eric Muel-

ler on the underlying issue. In addition, Detective Rogers has successfully shown he is entitled to qualified immunity on the claim that he violated Eric Mueller's constitutional right to post-deprivation notice. Accordingly, we remand for further proceedings consistent with this opinion.

**Reversed and Remanded.**

WALLACE, Senior Circuit Judge, concurring in part, and dissenting in part:

I agree with the majority's conclusion that Detective Rogers is entitled to qualified immunity from Eric Mueller's procedural due process claims. However, I part with the majority opinion in two significant respects. First, I believe the majority improperly exercises appellate jurisdiction over the district court's partial summary judgment to Eric on his procedural due process claims. This decision is plainly not final, so it cannot be appealed. Second, I disagree with the majority's articulated reasons for foregoing the first step of the *Saucier* qualified immunity analysis. The majority's approach on this issue misapprehends Supreme Court precedent, and abuses the discretion we retain in addressing qualified immunity claims on appeal.

I therefore concur only in the majority's conclusion that Detective Rogers is entitled to qualified immunity from Eric's procedural due process claims because there was no clearly established law guiding Detective Rogers' conduct on the night in question. I respectfully dissent from the majority's decision to exercise jurisdiction over the district court's partial summary judgment to Eric on those same claims. With respect to the jurisdictional issue, I believe that the majority's disposition deviates from important binding Supreme Court and Ninth Circuit precedent, resulting in an unacceptable conflict of law in our circuit.

# I

"[T]he right to a judgment from more than one court is a matter of grace and not a necessary ingredient of justice . . . ." *Cobbledick v. United States*, 309 U.S. 323, 325 (1940); *see also Abney v. United States*, 431 U.S. 651, 656 (1977) (holding that "it is well settled that there is no constitutional right to an appeal"). Thus, "[i]t must be remembered that the United States Court of Appeals is a creature of statute, and is vested with only statutory appellate jurisdiction as an appellate court, and not as a court of original jurisdiction as a trial court." *Henry v. Clarksdale Mun. Separate Sch. Dist.*, 409 F.2d 682, 691 (5th Cir. 1969); *see also United States v. Dior*, 671 F.2d 351, 354 (9th Cir. 1982) ("To prosecute its appeal before this court, appellant must show that it has the right to appeal and that the order appealed from comes within the terms of a statutory grant of appellate jurisdiction").

In that regard, Congress has provided the courts of appeals jurisdiction to review all "final decisions of the district courts." 28 U.S.C. § 1291. A "final decision" is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (internal quotations and citation omitted). Given this statutory limit on our appellate jurisdiction, "interlocutory appeals — appeals before the end of district court proceedings — are the exception, not the rule." *Johnson v. Jones*, 515 U.S. 304, 309 (1995). The Supreme Court has explained that this "final judgment rule promotes efficient judicial administration while at the same time emphasiz[es] the deference appellate courts owe to the district judge's decisions on the many questions of law and fact that arise before judgment." *Richardson-Merrell Inc. v. Koller*, 472 U.S. 424, 430 (1985); *see also Di Bella v. United States*, 369 U.S. 121, 124 (1962) ("This insistence on finality and prohibition of piecemeal review discourage undue litigiousness and leaden-foot administration of justice").

Against this doctrinal backdrop, our court has consistently held that "[o]rders granting partial summary judgment are, absent special circumstances, not appealable final orders under [section] 1291 because partial summary judgment orders do not dispose of all claims and do not end the litigation on the merits." *Williamson v. UNUM Life Ins. Co. of Am.*, 160 F.3d 1247, 1250 (9th Cir. 1998), *citing Serv. Employees Int'l Union, Local 102 v. County of San Diego*, 60 F.3d 1346, 1349 (9th Cir. 1995) and *Cheng v. Comm'r Internal Revenue Serv.*, 878 F.2d 306, 309 (9th Cir. 1989); *see also Way v. County of Ventura*, 348 F.3d 808, 809-10 (9th Cir. 2003) (holding that the court lacked appellate jurisdiction over a partial summary judgment on liability in a qualified immunity case).

In this case, however, the majority casts aside this binding authority, and exercises jurisdiction over the district court's non-final, interlocutory decision: a partial summary judgment to Eric on the merits of his procedural due process claims. Although the majority presents a number of novel legal theories to justify this departure from precedent, none survives serious scrutiny.

## A.

I begin, as does the majority, with *Mitchell v. Forsyth*, where the Supreme Court held that a district court's order, denying a claim of qualified immunity is "an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." 472 U.S. 511, 530 (1985). To reach this conclusion, the Court invoked the collateral order doctrine established in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). *Id.* at 524-25. This judicially crafted convention "recognizes that a limited class of prejudgment orders is sufficiently important and sufficiently separate from the underlying dispute that immediate appeal should be available." *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375 (1987). Applying this rule, the

Court in *Mitchell* carefully analyzed the nature of qualified immunity claims, and concluded that a district court's denial of such claims, "to the extent that it turns on an issue of law," falls within this narrow class of prejudgment orders. 472 U.S. at 524-30, 530.

In this case, the majority erroneously equates the district court's partial summary judgment with the qualified immunity order in *Mitchell*. The majority holds that "a grant of summary judgment to Eric Mueller as a matter of law on the merits of a constitutional claim, and against a defendant asserting qualified immunity, is the equivalent of a denial of such an assertion. Such denial where the district court has held that no cognizable factual dispute exists vests us with jurisdiction under the collateral order doctrine." The majority reasons that the district court's partial summary judgment to Eric "impose[s] the continuing burdens of litigation on Rogers, [and] effectively foreclose[s] his potential entitlement not to stand trial on damages and left outstanding a judgment against him that he violated Eric Mueller's constitutional rights." On this basis, the majority concludes that the "*substance* of the entitlement not to stand trial . . . demands the exception from the usual rule" that only final decisions are appealable pursuant to § 1291.

The majority's attempt to expand *Mitchell*'s jurisdictional holding is squarely foreclosed by the Supreme Court's decision in *Johnson*. In that case, the plaintiff charged the defendants with using excessive force during arrest. 515 U.S. at 307-08. The defendants filed a motion for summary judgment on qualified immunity grounds, arguing that there were no facts showing the defendants had participated in the alleged beating. *Id.* at 308. The district court denied the motion, holding that there was a genuine issue of material fact for trial regarding the defendants' roles in the arrest. *Id.* The defendants pursued an interlocutory appeal of this decision, citing *Mitchell*'s rule that orders denying qualified immunity are immediately appealable absent a final judgment. *Id.*

The Supreme Court dismissed the defendants' appeal for lack of appellate jurisdiction. In so ruling, the Court clarified that *Mitchell* was "explicitly limited . . . to appeals challenging, not a district court's determination about what factual issues are 'genuine,' but the purely legal issue [of] what law was 'clearly established.' " *Johnson*, 515 U.S. at 313 (internal citation omitted). The Court held that although summary judgment in that case also involved a question of law — whether there was a genuine issue of material fact for trial — that question also presented a "fact-related" legal inquiry. *Id.* at 314, 316. Indeed, reviewing a summary judgment may require a reviewing court to consult a "vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials." *Id.* at 316. The Court held that because the defendants' appeal involved this sort of "fact-based" issue of law, *Mitchell* did not supply jurisdiction over the appeal. *Id.* at 317-18.

*Johnson*'s reasoning controls here. Like the judgment from which the defendants appealed in *Johnson*, the district court's partial summary judgment presents without a doubt the sort of fact-based issue of law outside the scope of *Mitchell*'s jurisdictional holding. Reviewing the district court's partial summary judgment requires this court to canvass the "vast pretrial record" and rule on the sufficiency of Eric's evidence to establish his claims. *Johnson*, 515 U.S. at 316-17. Indeed, in reversing the district court's partial summary judgment, the majority reviews a number of "historical facts" purportedly militating in favor of reversal. Thus, as with the order *Johnson*, the district court's partial summary judgment does not present the sort of purely abstract issue of law that is immediately appealable under *Mitchell*.

This conclusion makes sense given the jurisdictional principles underlying the *Mitchell* decision. As described above, *Mitchell* relied on the collateral order doctrine established in *Cohen*. This judicially created rule is but "a narrow exception to the normal application of the final judgment rule." *Midland*

*Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989). To qualify for immediate appeal under this doctrine, an otherwise non-final order must "involve[ ] issues significantly different from those that underlie the plaintiff's basic case." *Johnson*, 515 U.S. at 314; *see also Cohen*, 337 U.S. at 546 (holding that a non-final order is immediately appealable where it "finally determine[s] claims of right *separable from, and collateral to*, rights asserted in the action" (emphasis added)). In this case, the district court's partial summary judgment to Eric involves an issue that is central to the merits of this lawsuit — whether Detective Rogers violated Eric's procedural due process rights. Thus, the majority's exercise of jurisdiction over this ruling, by expanding the collateral order doctrine beyond its properly narrow confines, contravenes important principles of finality, judicial modesty, and efficient case management. *See Johnson*, 515 U.S. at 311 (explaining that the separateness requirement of the collateral order doctrine means to save judicial resources and promote the efficient and timely disposition of cases).

The majority believes that none of the "worries" flowing from premature review of interlocutory orders is implicated by its exercise of jurisdiction. But by reviewing the partial summary judgment order now, the majority realizes the risk described by *Johnson* of "additional, and unnecessary, appellate court work either when [the interlocutory appeal] presents appellate courts with less developed record or when it brings them appeal that, had the trial simply proceeded, would have turned out to be unnecessary." 515 U.S. at 309. Indeed, in this case, because we already conclude that Detective Rogers is entitled to immunity from Eric's procedural due process claims, there is absolutely no need to rule on the merits of those claims.

The majority suggests that we should disregard the "form" of the final judgment rule, to vindicate the "substance" of the qualified immunity doctrine — to protect public officials from the burdens of litigation. But it is not at all clear in our case

that Detective Rogers would be subject to any further "burdens of litigation" after we reverse the district court's denial of qualified immunity. We all agree that Detective Rogers deserves immunity from suit. Therefore, although the district court has granted partial summary judgment to Eric, that judgment would no longer be enforceable.

However, if even after the protection of our opinion giving him qualified immunity, Detective Rogers chose to pursue further court action to expunge the district court's liability ruling, the Supreme Court has held that this potential exposure alone is insufficient to abrogate the final judgment rule. In *Johnson*, the Court acknowledged that its ruling may result in forcing some public officials to trial. 515 U.S. at 317. Still, the Court held that the many "countervailing considerations" animating the final judgment rule "are too strong to permit the extension of *Mitchell* to encompass appeals from orders of the sort before us." *Id.* at 317-18. The Court explicitly rejected the notion that *Mitchell* justifies a relaxation of the collateral order doctrine's requirements in order to protect officials against the burdens of trial. *Id.* at 315. We should follow that Supreme Court precedent here. *See also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1946 (2009) (stating that "[a]s a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in *Cohen*").

The majority also suggests there is significance in the "posture of Mitchell's case before the Supreme Court," implying that the Court did in fact exercise appellate jurisdiction over not only the denial of qualified immunity, but also the summary judgment on liability. A close reading of *Mitchell* disproves the majority's implication. True, the district court in that case both denied the defendants' summary judgment on qualified immunity grounds, and granted the plaintiff's summary judgment on liability. However, as made clear at the beginning of its opinion, the Court exercised jurisdiction over only the qualified immunity portion of the district court's

order. *Mitchell*, 472 U.S. at 513 (describing the issues on appeal as including "whether the District Court's finding that petitioner is not immune from suit for his actions under the qualified immunity standard . . . is appealable; and, if so, whether the District Court's ruling on qualified immunity was correct").

The majority misunderstands the Court's statement that it will also address "the District Court's decision — left standing by the Court of Appeals — that Mitchell's actions violated clearly established law." This language refers to the qualified immunity issue properly subject to the Court's interlocutory appellate jurisdiction; it does not (as the majority suggests) refer to the underlying merits of the plaintiff's claims. *Id.* at 530 (proceeding to analyze whether Mitchell's actions "violated clearly established law"), *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). Therefore, *Mitchell* does not support the exercise of appellate jurisdiction over the district court's partial summary judgment.

## B.

The majority also advances the theory that we have appellate jurisdiction over the partial summary judgment ruling because the ruling is "inextricably intertwined" with the district court's denial of qualified immunity. The majority cites *Swint v. Chambers County Commission*, 514 U.S. 35 (1995) to support this proposition. Notably, however, the "inextricably intertwined" language in that case was dicta, so its precedential value is questionable. *Id.* at 51 (stating without elaboration that "[t]he parties do not contend that the District Court's decision [denying the municipal defendant's partial summary judgment motion] was inextricably intertwined with that court's decision to deny the individual defendants' qualified immunity motions").

In any event, the majority suggests that this "inextricably intertwined" concept was adopted by our court in *Duran v.*

*City of Douglas*, 904 F.2d 1372 (9th Cir. 1990). In *Duran*, this court without citation of authority exercised jurisdiction over a partial summary judgment on the issue of section 1983 liability, reasoning that the legal issues involved in that appeal were "identical" to those at play in the concurrently filed, and jurisdictionally proper, appeal from a denial of qualified immunity. I do not believe that this exercise of jurisdiction was proper. But notwithstanding the merits of that decision, *Duran* does not support the majority's position.

As recited in the majority opinion, in *Duran*, the legal issues on appeal in the qualified immunity appeal, on the one hand, and the underlying section 1983 liability appeal, on the other, were identical—whether the defendant had violated clearly established constitutional protections. 904 F.2d at 1376. In this case, however, we have chosen to forgo the first step of the *Saucier* qualified immunity analysis, and proceed with step two. Thus, the primary issue in this appeal is whether, assuming Eric has constitutional rights to pre- and post-deprivation notice, those rights were clearly established at the time in question. That inquiry is entirely different from the inquiry required to resolve an appeal from the district court's partial summary judgment in favor of Eric on his procedural due process claims. That appeal asks whether, viewing the evidence in the light most favorable to Rogers, Eric has established a constitutional violation. Thus, it cannot be said that the issue to be addressed in the appeal from the district court's partial summary judgment is "identical" to the issue involved in the qualified immunity appeal.

*Duran* is further distinguishable because in that case "the relevant facts [were] not disputed." *Id.* at 1376. But here, as the majority recognizes, there are genuine issues of material fact with respect to whether Taige was in imminent danger. Thus, our determinations with respect to Eric's partial summary judgment and Rogers' claim to qualified immunity depend on two different sets of facts. On the partial summary judgment, we would have to view the evidence in the light

most favorable to *Rogers*, the nonmoving party. On the qualified immunity claim, we would view the evidence in the light most favorable to *Eric*, the allegedly injured party. This shifting factual landscape is precisely the situation the Supreme Court warned of in *Johnson*: one where the premature exercise of appellate jurisdiction over an interlocutory decision undermines the important values of the final judgment rule. *See Johnson*, 515 U.S. at 316-17. Thus, I do not believe *Duran* supplies appellate jurisdiction over the partial summary judgment in this case.

The majority's reliance on the Sixth Circuit's decision in *Brennan v. Township of Northville*, 78 F.3d 1152 (6th Cir. 1996) is similarly misplaced. In that case, the court exercised jurisdiction over a partial summary judgment reasoning that "our reversal of the district court's qualified immunity determination on the ground that [the plaintiff] has not alleged a constitutional violation is indisputably 'coterminous with, or subsumed in' the second issue: whether [the plaintiff] is entitled to summary judgment on the basis of a constitutional violation." *Id.* at 1158. But again, here, our reversal of the district court's qualified immunity determination is based on the second prong of *Saucier*. So it cannot be said that our qualified immunity ruling is "coterminous with, or subsumed in" the issue of whether Eric is entitled to partial summary judgment.

## C.

For these reasons, I disagree with the majority's decision to exercise appellate jurisdiction over the district court's partial summary judgment in favor of Eric on his procedural due process claims. I would instead refrain from hearing the appeal at this interlocutory stage of the proceedings.

## II.

I turn next to Detective Rogers' appeal from the district court's denial of his qualified immunity claim. This appeal is

undoubtedly subject to immediate review under *Mitchell*, and I agree that the district court should be reversed. However, I am concerned with how the majority reaches that conclusion.

As the majority recounts, the Supreme Court in *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) held that courts now have discretion to determine "which of the two prongs of the qualified immunity analysis [prescribed in *Saucier v. Katz*, 533 U.S. 194 (2001)] should be addressed first in light of the circumstances in the particular case at hand." In this case, the majority reasons, "[b]ecause we have concluded after reviewing the factual evidence on this issue in the light most favorable to Rogers — or for that matter to Eric Mueller — that there was a genuine issue of material fact as to whether Rogers was confronted with imminent danger to Taige at the time in question, we see no useful purpose in pursuing [the first step of *Saucier*]." The majority's reasoning is deficient in the context of qualified immunity.

The first step of *Saucier* asks whether, viewing the evidence in the light most favorable to the allegedly injured party, the record establishes a constitutional violation. 533 U.S. at 201. Nothing about this inquiry requires this court to resolve factual disputes in the record. In fact, the Supreme Court has clarified that the first step of the *Saucier* inquiry in no way requires courts to assume a fact-finding capacity; rather, a court generally just adopts the version of the facts set forth by the party challenging immunity. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (holding that the dispositive question in the first step of *Saucier* — whether those facts establish a constitutional violation — "is a pure question of law"). Thus, contrary to the majority's reasoning, the existence of a factual dispute as to the "imminent danger" does not justify skipping the first step of *Saucier*.

Unfortunately, the majority misapprehends this principle, stating that "if a factfinder were to decide that Rogers was indeed confronted with exigent circumstances, his failure to

contact Eric would not have violated Eric's rights. On the other hand, a factual decision to the contrary would produce an opposite constitutional result." Again, however, the first step of *Saucier* does not require this court to resolve this factual question. Rather, all we must do is view the facts in the light most favorable to Eric, and then decide whether those facts establish a constitutional violation. Therefore, it is irrelevant what a "factfinder" may or may not find based on the evidence presented in this case. At this stage in the dispute, we are required only to view the evidence in the light most favorable to the injured party — no factual findings are required. The majority's reference to this factual dispute as reason to skip step one of *Saucier* is therefore misplaced.

In addition, *Pearson* does not sanction departing from the *Saucier* sequence simply because there are disputed issues of fact in a given case. The majority cites a passage from *Pearson* where the Court observes that a court may depart from the *Saucier* sequence where "the constitutional question is so fact-bound that the decision provides little guidance for future cases." However, this example does not involve the existence of a factual dispute in the record.

As an initial matter, it is unclear what precisely the Court meant to convey with this dicta — after all, every constitutional ruling is necessarily "fact-bound" given that courts decide concrete disputes, not abstract hypothetical questions. But in *Buchanan v. Maine*, the case cited by the Court in *Pearson* in support of this dicta, the First Circuit skipped the first step of *Saucier* not because of factual disputes in the record, but because of the "complexity of the [constitutional issue faced], and since it is perfectly clear that the officers are entitled to immunity." 469 F.3d 158, 168 (1st Cir. 2006). In fact, the court in *Buchanan* expressly recognized that when performing the first step analysis, "the threshold question is whether all the uncontested facts and any contested facts *looked at in plaintiff's favor* show a constitutional violation." *Id.* (emphasis added). Therefore, this language in *Pearson*

does not support the position that the existence of an issue of fact should preclude a court from engaging in step one of *Saucier*.

Unlike the majority, I would hold that this is a case where the court can "rather quickly and easily decide that there was no violation of clearly established law," while the question at step one of *Saucier* is more difficult. *Pearson*, 129 S. Ct. at 820. Indeed, the first step inquiry asks us to determine whether due process requires a state official to give an absent parent notice of his decision to assume custody of a child for emergency medical purposes. We need not resolve this complicated constitutional issue, however, because both the majority and the dissent agree that even if such rights existed, they were not clearly established at the time of the relevant conduct. Thus, this case presents a prime example of a case where skipping the first step of *Saucier* is advisable because "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson*, 129 S. Ct. at 818.

### III.

For these reasons, I concur only in the majority's conclusion that Detective Rogers is entitled to qualified immunity. However, I respectfully dissent from the majority's attempt to exercise appellate jurisdiction over the district court's partial summary judgment in favor of Eric on his procedural due process claims. We must remember that our jurisdiction to hear appeals is strictly limited by statute and precedent. To hold that a partial summary judgment *on the merits* is akin to a denial of qualified immunity for the purposes of our appellate jurisdiction is a striking and unwarranted expansion of our limited jurisdiction.