**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DSPT INTERNATIONAL, INC., a
California corporation,
              *Plaintiff-Appellee,*

v.

LUCKY NAHUM, an individual,
              *Defendant-Appellant.*

No. 08-55062

D.C. No.
CV-06-00308-ODW

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted
May 6, 2009—Pasadena, California

Filed October 27, 2010

Before: Cynthia Holcomb Hall, Andrew J. Kleinfeld and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Kleinfeld

17849

**COUNSEL**

Andres F. Quintana, Quintana Law Group, APC, Woodland Hills, California, for the appellant.

John C. Gorman, Gorman & Miller, P.C., San Jose, California, for the appellee.

**OPINION**

KLEINFELD, Circuit Judge:

We address the scope of the Anticybersquatting Consumer Protection Act.

## I.   Facts

This case was tried to a jury, and the appellant challenges the jury verdict, so we "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor."[1]

DSPT, founded and owned by Paolo Dorigo, designs, manufactures, and imports men's clothing. The company sells clothes to between 500 and 700 retailers. It sells mostly shirts, but also some knitwear, trousers, and t-shirts. Its brand name since 1988 had been Equilibrio. To serve a younger market with somewhat "trendier, tighter fitting fashion," the company created the EQ brand name in 1999.

At about that time, Dorigo brought his friend Lucky Nahum into the business. Dorigo lived in Los Angeles, Nahum in Rochester, New York. They decided to set up a site on what was then the fledgling internet, and Nahum's brother, a hairdresser, was doing part-time website design, so DSPT had Nahum arrange to have his brother prepare the site. The website, "www.eq-Italy.com" (eq for the brand, Italy for Dorigo's and the style's origin), was created solely for DSPT for the purpose of showing DSPT clothes. Nahum's brother designed the website in consultation with Dorigo, though Nahum registered the site to himself. This seemed trivial at the time, since Nahum was working exclusively for DSPT and registration cost only $25. Dorigo, who was not knowledgeable or inter-

---

[1]*Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).

ested in computer matters, was unaware that the registration was in Nahum's name.

The importance of the website grew with the importance of the internet. By 2005, the website served as DSPT's catalog. Customers accessed it 24 hours a day, chose designs from it, and sent in orders through it. DSPT e-mailed them about new items on the site. Salesmen sold DSPT clothes to retailers by referring them to pictures on the website and soliciting their orders based on the pictures.

Unfortunately, during the same period, the friendship between Dorigo and Nahum soured. Nahum's DSPT contract was up for renewal August 31, 2005, so Dorigo sent him a proposal in mid-August. At the same time, DSPT paid Nahum's airfare, hotel, and meals for a trip to Las Vegas for the West Coast Exclusive Wear show, an offshoot of the largest menswear show in the world (MAGIC, Men's Apparel Guild in California) which was taking place in Las Vegas. But while there, Nahum spent time in a competitor's booth, and arranged employment with that DSPT competitor. Though Dorigo was also at the show and asked Nahum whether he would be renewing his contract, Nahum only informed Dorigo by e-mail after the show that he was not renewing his contract.

At the beginning of October, DSPT's website mysteriously disappeared. If a customer typed "eq-Italy.com" into his web browser, instead of seeing DSPT's clothing line, all he saw was a screen saying "All fashion related questions to be referred to Lucky Nahum at: lnahum@yahoo.com." Nahum had no use for the website, but he told his new boss at DSPT's competitor that "he had inserted that sentence in order to get Equilibrio [DSPT's older brand] to pay him funds that were due to him." DSPT repeatedly but unsuccessfully asked Nahum to give back the website.

This created a crisis for DSPT. Retailers do around three fourths of their business during the last quarter of the year, so

wholesalers and manufacturers, like DSPT, do a large percentage of their business supplying retailers during October, November, and the first part of December. DSPT's website in the fall also generated the orders for the upcoming spring. Without its website, DSPT could not sell anything in a manner approaching its previous efficiency. It was forced to go back to the old way of sending out samples, but retailers did not want to deal with DSPT using the old method. Sales plummeted and inventory was left over in the spring from the very bad fall. 2004 had been good, and the first quarter of 2005 was the best ever, but the last quarter of 2005, and all of 2006, were disastrous. A lot of inventory had to be sold below cost. DSPT spent $31,572.72, plus a great deal of time, writing to customers to explain the situation and replacing its website and the stationery that referred customers to "eq-Italy.com."

DSPT sued Nahum for "cybersquatting" and trademark infringement in violation of the Lanham Act.[2] Nahum counterclaimed for $14,936.86 in additional commissions he claimed he was owed.

The case was tried to a jury. The jury returned a special verdict, finding, among other things, that "EQ" and "Equilibrio" were valid trademarks owned by DSPT; that "Lucky Nahum registered, trafficked in, or used the www.eq-Italy.com domain name"; that the name was identi-

---

[2]Only the cybersquatting claim is on appeal. DSPT also brought claims (1) for unfair competition and misleading advertising under California Business and Professional Code §§ 17200 and 17500, (2) for intentional interference with prospective business relations, and (3) for negligent interference with prospective business relations. DSPT voluntarily dismissed its negligent interference claim. After trial, the district court granted Nahum's motion for judgment as a matter of law as to the trademark infringement claim and the intentional interference claim. The district court also rejected DSPT's claims under sections 17200 and 17500. DSPT also sued Jaysix, the competitor for whom Nahum went to work, but all claims against Jaysix were dismissed and are not before us.

cal or confusingly similar to DSPT's distinctive trademark; and that "Lucky Nahum commit[ed] the acts with a bad faith intent to profit from DSPT's mark." The jury found that DSPT's damages were $152,000. As for Nahum's counterclaim for commissions, the jury found that DSPT did not breach its contract with him and owed him nothing.

The district court denied Nahum's renewed motions for judgment as a matter of law, remittitur, and new trial. Nahum appeals, and we affirm.

## II.   Analysis

### A.   Standard of Review

We review denial of a motion for judgment as a matter of law de novo,[3] and denial of a motion for new trial and remittitur for abuse of discretion.[4] A district court may grant a new trial only if the jury verdict is contrary to the clear weight of the evidence.[5] The district court's denial of a motion for a new trial is reversible "only if the record contains no evidence in support of the verdict" or if the district court "made a mistake of law."[6] "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion."[7] "We must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor."[8] A jury verdict

---

[3]*Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

[4]*Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1107-08 (9th Cir. 1991).

[5]*Silver Sage Partners Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).

[6]*Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks and citations omitted).

[7]*Pavao*, 307 F.3d at 918.

[8]*Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).

should be set aside only when "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."[9]

On appeal, Nahum argues that the anti-cybersquatting statute has no application to the conduct in this case, that DSPT did not own the trademarks and that EQ-Italy was not identical or confusingly similar to DSPT's marks, that there was no evidence of bad-faith intent to profit, and that there was insufficient evidence to support the damages award.

### B.   The Anticybersquatting Consumer Protection Act.

**[1]** The Anti-Cybersquatting Consumer Protection Act establishes civil liability for "cyberpiracy" where a plaintiff proves that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted "with bad faith intent to profit from that mark."[10]

Nahum first argues that as a matter of law, this statute does not apply to what he did. He argues that the statute applies

---

[9]*Id.*

[10]In relevant part, the statute reads:

A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—

(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark.

15 U.S.C. § 1125(d)(1)(A).

only to one who registers a well-known trademark as a domain name, and then attempts to profit in bad faith by either (1) selling the domain name back to the trademark holder, or (2) using the domain name to divert business from the trademark holder. He argues that he cannot owe damages under the statute because the evidence shows only that he used DSPT's mark to gain leverage over DSPT in bargaining for money he claimed he was owed, not to sell under DSPT's mark or sell the mark to DSPT. He argues that even if in some sense he had a bad-faith intent to profit, any "intent to profit" under the act must be an intent to profit from the goodwill associated with the mark rather than to gain some other benefit. The core of his argument is that he did not register the domain name in bad faith, and used it only to get what he was entitled to.

**[2]** His arguments are not implausible, but we conclude that they are mistaken. True, the statute was intended to prevent cybersquatters from registering well-known brand names as internet domain names in order to make the trademark owners buy the ability to do business under their own names.[11] Nahum cites a remark in a Senate Committee report mentioning the intent to profit from the goodwill associated with someone else's trademark.[12] And the Sixth Circuit noted that "[t]he paradigmatic harm that the [Anticybersquatting Consumer Protection Act] was enacted to eradicate [was] the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark."[13]

---

[11]*Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002).

[12]S. Rep. No. 106-140 at 9-10 (1999), *available at* http://frwebgate. access.gpo.gov/cgi-bin/getdoc.cgi?dbname=106_cong_reports&docid=f:sr 140.pdf.

[13]*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004).

**[3]** But the statute, like so many, is written more broadly than what may have been the political catalyst that got it passed. As in *Bosley Medical Institute v. Kremer*, we conclude that the words of the statute are broader than this political stimulus that led to its enactment.[14] Though there was no evidence of anything wrong with Nahum's registration of the domain name to himself, the evidence supported a verdict that Nahum subsequently, years later, used the domain name to get leverage for his claim for commissions. The statute says "registers, traffics in, or uses," with "or" between the terms, so use alone is enough to support a verdict, even in the absence of violative registration or trafficking.

**[4]** As for whether use to get leverage in a business dispute can establish a violation, the statutory factors for "bad faith intent" establish that it can.[15] "Evidence of bad faith may arise

---

[14]403 F.3d 672, 680-81 (9th Cir. 2005).

[15]15 U.S.C. §§ 1125(d)(1)(B)(i)(I)-(IX). The factors considered are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

well after registration of the domain name."[16] The statute contains a safe harbor provision, excluding a finding of "bad faith intent" for persons who reasonably believed that use of the domain name was fair use or otherwise lawful,[17] but that safe harbor has no application here. Nahum could not have reasonably believed that he could lawfully use "eq-Italy" when he no longer worked for DSPT. The safe harbor protects uses such as parody and comment,[18] and use by persons ignorant of another's superior right to the mark.[19]

[5] The statute provides that a court "may consider factors such as, but not limited to" the previously enumerated list of nine.[20] Nahum does not challenge the jury instruction, which listed all of the factors, even though some have no bearing on

---

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

[16]*Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009) (citation omitted).

[17]15 U.S.C. § 1125(d)(1)(B)(ii).

[18]*See, e.g.*, *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906-07 (9th Cir. 2002).

[19]*See, e.g.*, 15 U.S.C. § 1114 (innocent infringement by publishers); 15 U.S.C. § 1115 (innocent infringement as a defense to right to use a mark).

[20]*See supra* n.15; *see also* 15 U.S.C. § 1125(d)(1)(B)(i).

this case, and some do not offer either side much support. One of the factors, number VI in the statute, strongly supports DSPT's claim. That factor notes that it is "indicative" of a "bad faith intent to profit" from the mark if the person offering to transfer the domain name to the owner of the mark has never actually used or intended to use the domain name for bona fide sales of goods.[21]

**[6]** Factor VI may fairly be read to mean that it is bad faith to hold a domain name for ransom,[22] where the holder uses it to get money from the owner of the trademark rather than to sell goods. The jury had evidence that Nahum was using the "eq-Italy.com" domain name as leverage to get DSPT to pay him the disputed commissions, not for the bona fide sale of clothes. Though there was no direct evidence of an explicit offer to sell the domain to DSPT for a specified amount, the jury could infer the intent to give back the site to DSPT only if DSPT paid Nahum the disputed commissions.

The "intent to profit," as factor VI shows, means simply the intent to get money or other valuable consideration. "Profit" does not require that Nahum receive more than he is owed on his disputed claim. Rather, "[p]rofit includes an attempt to procure an advantageous gain or return."[23] Thus, it does not

---

[21]The subprovision reads: "the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct . . . ." 15 U.S.C. § 1125(d)(1)(B)(i)(VI).

[22]*See Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005) (stating that cybersquatting "occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either *ransoming the domain name back* to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." (emphasis added) (quoting *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004))).

[23]*Coca-Cola Co. v. Purdy*, 382 F.3d 774, 786 (8th Cir. 2004) (internal quotation marks omitted).

matter that, as the jury concluded, Nahum's claim for unpaid commissions was meritless, because he could not hold the domain name for ransom even if he had been owed commissions.

**[7]** In this case, shortly after DSPT's content disappeared from eq-Italy.com, Nahum e-mailed Dorigo stating that the eq-Italy.com website would be back up under a new format. Nahum testified that he would transfer the domain to DSPT after Nahum and DSPT were able to resolve the "monetary issues regarding [Nahum's] commissions." Nahum's subsequent employer testified that Nahum told him that DSPT wanted the website returned to them, but Nahum was keeping it to use it as leverage in order to get the money he said DSPT owed him. This is evidence of an "intent to profit" under the Act.

## C.   Distinctive and Confusingly Similar

**[8]** Nahum's second argument is that there was no evidence from which a jury could conclude that "www.eq-Italy.com" was a distinctive mark, or that it was confusingly similar to DSPT's "EQ" mark. The latter point is meritless, since the evidence showed that only DSPT used the mark "EQ" for a men's shirts line, and used the Italian fashion connection as a selling point. Even though DSPT had not registered the "EQ" mark, ownership of common law trademark "is obtained by actual use of a symbol to identify the goods or services of one seller and distinguish them from those offered by others."[24] The evidence shows that DSPT used the mark in commerce in fall 1999, when it exhibited EQ at the New York fashion shows[25] and thereafter used the "EQ" symbol. Although Nahum showed that others used an "EQ" mark

---

[24]2 J.T. McCarthy, *Trademarks and Unfair Competition* § 16:1 (4th ed. 2010). *See also Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001).

[25]*See Chance*, 242 F.3d at 1156-59 (applying totality of the circumstances test and determining that pre-sales activity could qualify mark for trademark protection); *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1199 (9th Cir. 1979) (holding "that appellee established a prior use of the mark without an actual sale"); *see generally* 2 McCarthy §§ 16:12-14.

in subsequent years for other sorts of goods, such as online publications, engine cylinder heads, and bicycles, no one would likely confuse these goods with DSPT's.[26] The only other use that was even arguably confusingly similar was EQ equestrian clothing, but the jury could conclude that retailers shopping for men's shirts are unlikely to be confused by a mark also used for equestrian clothing, and that the style in which the marks were displayed was too different to foster confusion. The shirts were marked by the letters EQ, whereas the equestrian apparel was marked by a rectangle inside another rectangle.

[9] As for whether "eq-Italy.com" is "confusingly similar"[27] to EQ, a jury could reasonably conclude that in the context of men's shirts, it was. The jury could have concluded that, at the time Nahum used it, the mark was distinctive and his use of the site after leaving DSPT would confuse retailers trying to shop DSPT's catalog at the website where they had done so before.[28] In fact, as Dorigo testified, several customers were actually confused by the alteration of the website. "Now, people would still call and say, what happened? Where is it? You know, they wanted to know what's this screen?" By

---

[26]*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) ("Even where there is precise identity of a complainant's and an alleged infringer's mark, there may be no consumer confusion—and thus no trademark infringement—if the alleged infringer is in a different geographic area or in a wholly different industry." (citing *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 515-16 (C.C.P.A. 1980))).

[27]The relevant subprovision is 15 U.S.C. § 1125(d)(1)(A)(i)(I), which attaches liability to a person who "registers, traffics in, or uses a domain name that[,] in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark . . . ."

[28]The usual eight factors from *AMF Inc. v. Sleekcraft Boats* for determining whether passing off one's goods as another is "confusingly similar" are a poor fit in this context, because they are designed to address a different social harm than the cybersquatting statute. 599 F.2d 341, 348-49 (9th Cir. 1979).

2005, eq-Italy.com was identified with EQ and Equilibrio. The similarity of "EQ" and "eq-Italy" is considerably greater than "perfumebay.com" and "ebay.com," which we held were similar, and thus the jury's finding should be upheld.[29]

*D. Damages*

**[10]** Nahum argues that there was insufficient evidence to support the damages award of $152,000. Under the cybersquatting statute, DSPT was entitled to "any damages" it sustained,[30] which, like tort damages, are the reasonably foreseeable harms caused by the wrong.[31] The district court barred the testimony of DSPT's expert witness (a ruling not on appeal), so there was no testimony supporting a precise number. But the jury did have as admitted exhibits DSPT's 2002-2006 financial statements providing detailed information on sales, expenses, and profits for all those years, as well as DSPT's president's testimony about the financial impact of Nahum's cyberpiracy.

The wronged party has the burden of proof as to damages,[32] but the nature of the proof required depends on the circumstances of the case.[33] The calculation is "subject to the principles of equity."[34] Because Nahum did not, so far as the record indicates, divert trade from DSPT to himself or his new

---

[29]*Perfumebay.com Inc. v. Ebay, Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007).

[30]15 U.S.C. § 1117(a).

[31]*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) (quoting 2 J.T. McCarthy, *Trademarks and Unfair Competition* § 30:27, at 509 (2d ed. 1984)). *See also* Restatement (Third) of Unfair Competition § 36(1) (1995).

[32]*Lindy*, 982 F.2d at 1407; *see also* Restatement (Third) of Unfair Competition § 36 cmt. c (1995).

[33]*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997); *Lindy*, 982 F.2d at 1410-11.

[34]15 U.S.C. § 1117(a).

employer, "defendant's profits"[35] were not sought and are not at issue, only consequential damages to DSPT.

[11] Nahum's conduct was not an unintentional infringement where the defendant failed to provide financial information it should have been able to provide, as in *Lindy Pen Co., Inc. v. Bic Pen Corp.*[36] It was an intentional infringement, so our language in *Intel Corporation v. Terabyte International, Inc.*[37] applies. *In Intel*, we affirmed a "crude" measure of damages that depended on an inference that was "not inexorable, neither [was] it fanciful."[38]

[12] In the circumstances of this case, precision in the calculation of damages is neither necessary nor possible. Nahum's wrong made it impossible to know with any precision what DSPT's sales would have been had he not committed his wrong. Requiring more precision than can be attained, especially where the impossibility of more precise ascertainment was the fault of the wrongdoer, would be inequitable and is not required. "[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."[39] Just as a business could not know how many phone calls it did not get because its phone number was wrong in the yellow pages, DSPT could not know how many shirts it did not sell because retailers could not find its website.

[13] Given the impossibility of precise measurements, the jury had sufficient tools for estimating DSPT's actual dam-

---

[35]*Id.*

[36]982 F.2d 1400 (9th Cir. 1993).

[37]6 F.3d 614 (9th Cir. 1993).

[38]*Id.* at 621.

[39]*Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927).

ages, including financial statements bracketing the period of the loss and testimony that DSPT spent $31,572.72 recreating its website. The law does not require expert testimony to establish damages,[40] though that would have made the jury's task easier. It is hard to see what additional data, as opposed to opinion, could have been provided that would have been of any use. Nahum argues that DSPT is not entitled to damages for the expense of recreating the website, but we cannot see why not, since that was a natural and foreseeable consequence of his holding the original site for ransom.

The testimony and DSPT's financial statements showed gross profits down around $620,000 in 2006, after an excellent start in early 2005 but a decline when the website disappeared after Nahum took his new job. DSPT presented evidence that the August 2005 show went very well and that the men's clothing market generally went up in 2005-2006. "Proof of a decline in sales combined with evidence tending to discount the importance of other market factors, such as the evidence of positive business conditions and the success of similar businesses not subject to the defendant's tortious conduct, can be sufficient to establish a causal connection between the plaintiff's decline in sales and the misconduct of the defendant."[41]

---

[40]Section 1117 "confers a wide scope of discretion upon the district judge in the fashioning of a remedy." *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968). Many sources can provide the requisite information upon which a reasonable jury may calculate damages. *Cf. Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985) (upholding calculation of damages based on statements made on a videotape and noting that "[r]ecovery under section 1117 is not limited to cases in which the quantum of actual damages is demonstrated.").

[41]Restatement (Third) of Unfair Competition § 36 cmt. h (1995); *see also Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927) ("The plaintiff had an established business, and the future profits could be shown by past experience. It was permissible to arrive at net profits by deducting from the gross profits of an earlier period an estimated expense of doing business.").

**[14]** We must uphold the jury's damages verdict "whenever possible, and all presumptions are in favor of the judgment."**42** It is quite possible that the jurors believed Dorigo's testimony about the impact on sales of the unavailability of DSPT's website, and some jurors were familiar with financial statements and went through them, showing the other jurors that $150,000 was a reasonable estimate of the lost profits and replacement cost. In closing argument, DSPT's lawyer argued based on the financial statements for lost sales of $1,200,000 for the relevant period, and a profit margin around 20%, plus approximately $32,000 for rebuilding the web site. After subtracting $32,000 from the $152,000 award, only $120,000 of lost profits need to be justified. DSPT's closing argument would suggest a figure of about $240,000 for lost profits (20% of $1,200,000). The jury might reasonably have examined the financial statements, discounted the $240,000 in light of the financial statements and in light of other inferences that might explain some of the loss, and concluded that about one half DSPT's lawyer's argued figure, $120,000, was a fair estimate of its lost profits. That would not be unreasonable.

### III.   Conclusion

Even if a domain name was put up innocently and used properly for years, a person is liable under 15 U.S.C. § 1125(d) if he subsequently uses the domain name with a bad faith intent to profit from the protected mark by holding the domain name for ransom. The evidence sufficiently supported the jury's verdict that Nahum did so, causing $152,000 in damages to DSPT.

**AFFIRMED.**

---

**42***Bouman v. Block*, 940 F.2d 1211, 1234 (9th Cir. 1991).