**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERIC MUELLER; CORISSA D.
MUELLER, husband and wife,
individually and on behalf of
Taige L. Mueller, a minor, and on
behalf of themselves and those
similarly situated,
          *Plaintiffs-Appellants,*

         v.

APRIL K. AUKER; BARBARA
HARMON; JANET A. FLETCHER;
KIMBERLY A. OSADCHUK; LINDA
RODENBAUGH; KARL B. KURTZ; KEN
DIEBERT,

          *Defendants,*

      and

CITY OF BOISE; DALE ROGERS; TED
SNYDER; TIM GREEN; RICHARD K.
MACDONALD; SAINT LUKE'S
REGIONAL MEDICAL CENTER, LTD.,
          *Defendants-Appellees.*

No. 11-35351

D.C. No.
1:04-cv-00399-BLW

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
July 24, 2012—Boise, Idaho

Filed September 10, 2012
Amended October 25, 2012

12907

Before: J. Clifford Wallace, Stephen S. Trott, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Trott

**COUNSEL**

Michael E. Rosman, Center for Individual Rights, Washington, D.C., for the plaintiffs-appellants.

Kirtlan G. Naylor, Naylor & Hales, P.C., Boise, Idaho; Keely Elizabeth Duke and Richard E. Hall, Duke Scanlan Hall PLLC, Boise, Idaho; and W. Christopher Pooser, Stoel Rives LLP, Boise, Idaho, for the defendants-appellees.

James K. Dickinson, Ada County Prosecutor's Office, Boise, Idaho, for amicus curiae Ada County Prosecutor's Office.

---

**ORDER**

The Opinion filed September 10, 2012, is amended as follows: on slip opinion page 10863, line 6, replace the first full paragraph (Part IV B, Battery) beginning "We conclude that the district court . . . ." with the following text:

> The district court dismissed the Muellers' battery claim against Dr. Macdonald pursuant to Federal Rule of Civil Procedure 50(a). The record conclusively establishes that he did not treat Taige until he was given consent to do so by April Auker on behalf of the Idaho Department of Welfare. *Mueller v. Auker*, 576 F.3d at 984-86. At the time, the State had taken legal custody of the Muellers' daughter. *Id.*
>
> *Neal v. Neal*, 125 Idaho 617, 622; 873 P.2d 871, 876 (1994), states that "[c]ivil battery consists of an intentional, unpermitted contact upon the person of another which is either unlawful, harmful or offensive." *Id.* The Supreme Court of Idaho also held that "lack of consent is . . . an essential element of battery," and that "[c]onsent obtained by fraud or misrepresentation vitiates the consent and can render the offending party liable for a battery." *Id.*
>
> Auker's consent to treatment was valid unless obtained by fraud or misrepresentation. Although we ordinarily view the evidence on this issue in the light most favorable to the non-moving party, *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205-06 (9th Cir. 2008), the issue of possible fraud or misrepresentation on the part of Dr. Macdonald leading to

April Auker's consent has now been resolved by dispositive events. As previously discussed in Part IV.A of this opinion, the issue of whether or not Dr. Macdonald knowingly made a false report to Detective Rogers of imminent danger to Taige in order to deprive the Muellers of their parental rights was litigated and did go to the jury. In a special verdict, the jury rejected the Muellers' theory. This finding of fact is fully supported by the record and conclusively determines between these parties in favor of Dr. Macdonald the factual issue of the validity of the State's consent to treat Taige upon which he relied. The jury's verdict is entitled to preclusive effect pursuant to the doctrine of collateral estoppel. Therefore, this issue is moot because it has become merely academic and thus no longer justiciable.

The panel has voted to deny the petition for panel rehearing. Judge Smith has voted to deny the petition for rehearing en banc and Judges Wallace and Trott so recommend.

The full court has been advised of the suggestion for rehearing en banc and no judge of the court has requested a vote on it. Fed. R. App. P. 35(b).

With this amendment, the petition for rehearing, and the petition for rehearing en banc are otherwise DENIED. No further petitions for rehearing will be accepted.

---

## OPINION

TROTT, Circuit Judge:

Because the district court and the parties to this protracted lawsuit—as well as the judges of this panel hearing the issues for the second time—are well aware of its history, the trial

record, and the proceedings in district court, we refer to them only as necessary to explain our decision. We have previously published an opinion on a related issue in *Mueller v. Auker*, 576 F.3d 979 (9th Cir. 2009). That opinion exhaustively unfurls the facts giving rise to this case.

We have jurisdiction over this timely appeal pursuant to 28 U.S.C. §§ 1291 and 1294(1), and we affirm. We address each new issue in turn.

# I

## A

### Qualified Immunity

**[1]** We begin our discussion of whether Detective Dale Rogers and Officers Ted Snyder and Tim Green are entitled to qualified immunity for their actions involving the interruption of Corissa Mueller's parental rights with a review of that important principle as reiterated by the Supreme Court in recent cases.

> "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. ___, ___ (2011) (slip op., at 12) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[W]hether an official protected by qualified immunity may be held personally liable for an

allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted).

*Messerschmidt v. Millender*, 565 U.S. ___, 132 S. Ct. 1235, 1244-45 (2012). The inquiry called for by this doctrine "must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (internal quotation marks omitted)). Accordingly, "the result [of this inquiry] depends very much on the facts of each case." *Id.* at 201. Finally, "[t]he contours of the right must be sufficiently clear [in a particularized sense] that a reasonable official would understand that what he is doing violates that right." *Id.* at 199 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal quotation marks omitted)).

In order to apply this doctrine correctly, which makes allowance for some constitutional mistakes, it is useful to revisit its purpose:

> Nor is it always fair, or sound policy, to demand official compliance with statute and regulation on pain of money damages. Such officials as police officers or prison wardens, to say nothing of higher level executives . . . who enjoy only qualified immunity, routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them. These officials are subject to a plethora of rules, "often so voluminous, ambiguous, and contradictory, and in such flux that officials can only comply with or enforce them selectively." See P. Schuck, Suing Government 66 (1983). In these circumstances, officials should not err always on the side of caution. "[O]fficials with a broad range of duties and

> authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office." *Scheuer v. Rhodes*, [416 U.S. 232, 246 (1974))].

*Davis v. Scherer*, 468 U.S. 183, 196 (1984) (second alteration in original). We review the district court's grant of summary judgment de novo. *Burke v. Cnty. of Alameda*, 586 F.3d 725, 730 (9th Cir. 2009). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (internal quotation marks omitted).

With this framework in mind, we must decide whether, at the time of Detective Rogers's and Officers Snyder's and Green's actions, it was "clearly established" that they were violating (1) the Mueller's Fourteenth Amendment's liberty interest in the care, custody, and control of their infant daughter Taige, and (2) Corissa Mueller's Fourth Amendment right against unreasonable search and seizure. In other words, viewing the facts in the light most favorable to the Muellers, did the officers have an objectively reasonable basis for fearing that Taige was in imminent danger and for causing her parents to lose custody without a judicial hearing, and that "a reasonable officer could have come to such a conclusion." *Ryburn v. Huff*, 565 U.S. ___, 132 S. Ct. 987, 992 (2012) (per curiam).

**B**

**The Constitutional Rights at Issue**

There is no doubt that the Muellers have a liberty interest in the "care, custody, and control of their child[ ]." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Lehr v. Robertson*, 463 U.S. 248, 256-57 (1983). It is also the case, however, that like all constitutional rights, these rights are not absolute. Under

certain circumstances, these rights must bow to other counter-
vailing interests and rights, such as the basic independent life
and liberty rights of the child and of the State acting as *parens
patriae*; and on occasion, this accommodation may occur
without a pre-deprivation hearing. As the Supreme Court has
said, a state "has an urgent interest in the welfare of the child
. . . ." *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981);
*see also J.B. v. Washington Cnty.*, 127 F.3d 919, 925, 927
(10th Cir. 1997) (parents' liberty interest in the custody and
care of their children is balanced against the state's "tradi-
tional and transcendent" interest in "acting as *parens patriae*"
to protect children); *Thomason v. SCAN Volunteer Servs.,
Inc.*, 85 F.3d 1365, 1371 (8th Cir. 1996) ("[T]he liberty inter-
est in familial relations is limited by the compelling govern-
ment interest in the protection of minor children, particularly
in circumstances where the protection is considered necessary
as against the parents themselves." (quoting *Myers v. Morris*,
810 F.2d 1437, 1462 (8th Cir. 1987) (internal quotation marks
omitted)).

When do the constitutional rights of parents step aside? "In
an emergency situation . . . when the children are subject to
immediate or apparent danger or harm." *Caldwell v. LeFaver*,
928 F.2d 331, 333 (9th Cir. 1991). As we explained in *Ram
v. Rubin*, parents have a "constitutionally protected right to
the care and custody of [their] children" and cannot be "sum-
marily deprived of that custody without notice and a hearing,"
except where "the children [are] in imminent danger." 118
F.3d 1306, 1310 (9th Cir. 1997) (citing *Caldwell*, 928 F.2d at
333); *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983)
("When a child's safety is threatened, that is justification
enough for action first and hearing afterward.").

**[2]** With this context in mind, the issue before us, as cor-
rectly articulated by the district court, is whether on August
12, 2002, the law was clearly established that Detective Rog-
ers (1) had to secure a judicial hearing for the Muellers before
seizing Taige for medical treatment, (2) should not have

declared that Taige was in imminent danger and caused her custody to be transferred to the Department of Health and Welfare, and (3) should not have temporarily confined Corissa after seizing her daughter.

## C

## Analysis

**[3]** In declaring the infant Taige to be in "imminent danger" of serious bodily injury pursuant to the Idaho Child Protective Act, Detective Rogers relied on the opinions of qualified medical professionals: the board-certified emergency room doctor treating the infant, Dr. Richard Macdonald; and a board-certified pediatrician, Dr. Noreen Womack, with whom the treating physician had conferred. Dr. Womack recommended contacting a social worker should Corissa continue to refuse treatment for her daughter. In taking her daughter to the emergency room, Corissa's goal was the same as her husband's, her personal physician's, Detective Rogers's, Dr. Macdonald's, and Dr. Womack's: to rule out, *inter alia*, meningitis, a serious medical condition capable of causing an infant's death or permanent brain injury. As Eric Mueller explained in his deposition, going to the emergency room "would be the safe thing to do." In his deposition, Eric attributed a similar state of mind to Detective Rogers: concern about Taige's health. The medical standard of care Corissa's naturopathic physician told Corissa she would encounter in the emergency room was the administration of antibiotics and a lumbar spinal tap, a standard also designed to protect the patient. On the facts of this case, we conclude that Detective Rogers's declaration of "imminent danger" was objectively reasonable.

The district court summarized its analysis of this issue as follows:

> This lack of clearly established law is most apparent in Detective Rogers' imminent danger analysis.

> He was confronted with a physician insisting (1) that the treatments be done, (2) that they be done quickly, (3) that they constituted the standard of care, (4) that the risk of foregoing treatments outweighed the risks of treatment, (5) that the treatments would completely eliminate any danger to Taige, and (6) that if Corissa left with Taige untreated, Taige's condition could deteriorate so quickly that she could suffer serious injury or die before Corissa could return to the hospital.

> In this situation, no clearly established law existed to guide Detective Rogers. The phrase "imminent danger" has not been given any detailed definition, either by *Wallis [v. Spencer*, 202 F.3d 1126 (9th Cir. 2000)] or any other case, that could have guided Detective Rogers.

Reviewing this analysis de novo, *see Burke*, 586 F.3d at 730, we conclude that it is amply supported by the record.

**[4]** In arriving at this conclusion, the district court stated that "[t]he Court's research, and the parties' briefing do not reveal any cases which have laid out the constitutional guidelines for resolving parental [non-religious] objections to medical treatment . . . ." Five years later, the Muellers still have not provided us with any cases specific enough to the emergency room facts and circumstances of this case to advance their cause. We have not uncovered a decision identifying a Fourteenth Amendment violation "on facts even roughly comparable to those present in this case." *Ryburn*, 565 U.S. at ___, 132 S. Ct. at 990. Nowhere can we find any clearly established law which would have required a judicial hearing before Detective Rogers or the Department of Health and Welfare took the actions that they did when facing these dangers.

When examined at the level of specificity mandated by *Brosseau*, *Wallis*, as we discussed at length in our previous

opinion, is "manifestly distinguishable." *Mueller*, 576 F.3d at 995-96. To repeat: "This inquiry 'must be undertaken in [the] light of the specific context of the case, not as a broad general proposition.' " *Id.* at 994 (quoting *Saucier v. Katz*, 533 U.S. at 201). In effect, the Muellers ask us to repeat the analytical mistake we made in *Brosseau*, where we approached this issue based upon general tests and abstract constitutional propositions instead of focusing on the precise factual scenario confronted by the officers. 543 U.S. at 199-200. In fact, *Wallis*, the Muellers' principal case, stands for the unremarkable proposition that parents and children can be separated "without due process of law . . . in an emergency." *Wallis*, 202 F.3d at 1136.

Idaho law permits a police officer to place a child in shelter care *without a court order* when necessary to prevent serious physical injury. I.C. § 16-1612 (since renumbered as I.C. § 16-1608). The Muellers' late assertion in their reply brief that this law is "obviously unconstitutional" is of no help to them on this issue, because at the time the disputed decisions were made, no clearly established law existed to that effect. Moreover, the existence of a state statute authorizing an official's disputed conduct weighs in that official's favor, so long as the statute itself does not offend the Constitution, and I.C. § 16-1612 does not. *Caldwell*, 928 F.2d at 334.

Detective Rogers was in no position to second guess Dr. Macdonald. Even were we to assume with hindsight that the doctor's assessment was wrong, to attribute such a professional error in judgment to Detective Rogers would be manifestly inappropriate. The Muellers admit it was objectively reasonable for Detective Rogers to accept the doctor's opinion over Corissa's. The Supreme Court has instructed that "reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and that '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that

are tense, uncertain, and rapidly evolving.' " *Ryburn*, 565 U.S. at ___, 132 S. Ct. at 992 (alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). When Taige's temperature spiked at 1:40 a.m., time became of the essence, and it was at that point that Detective Rogers made his decision. *Mueller*, 576 F.3d at 985. The district court correctly observed that the term "imminent danger" has not been given any detailed definition . . . that could have guided Detective Rogers. Contrary to the Muellers' arguments, *Wallis* does not require that to justify a declaration of imminent danger, the imminent danger must be likely to occur. *See* 202 F.3d at 1138. Even if our later case *Rogers v. County of San Joaquin*, 487 F.3d 1288 (9th Cir. 2007) imposes such a requirement, *Rogers* could not have made any potential unlawfulness "apparent in light of preexisting law" in 2002. *See Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996).

**[5]** The Muellers also argue that although "Rogers was entitled to consider [Dr.] MacDonald's medical opinion," he was not entitled to rely on the doctor's "legal opinion." However, Detective Rogers made his own decision as to imminent danger. That decision had legal consequences, but it was rationally based on the objective facts of the situation.

**[6]** In summary, Detective Rogers, along with Officers Snyder and Green (who made no decisions at all), are entitled to qualified immunity from this lawsuit. Ironically, it has taken ten years of litigation to arrive at this conclusion.

## D

### The Fourth Amendment

**[7]** The Fourth Amendment usually requires an officer to have a warrant issued upon probable cause before seizing someone, but "neither probable cause nor a warrant is required when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause require-

ment impracticable.' " *Yin v. California*, 95 F.3d 864, 869 (9th Cir. 1996) (quoting *Veronica Sch. Dist. v. Acton*, 515 U.S. 646, 653 (1995)). In these "special needs" cases, we "dispense[ ] with the probable cause and warrant requirements and simply appl[y] a balancing test to determine if a search or seizure is reasonable and thus constitutional." *Yin*, 95 F.3d at 869.

**[8]** Under the circumstances of this case, the officers' separation of Corissa Mueller from her daughter while medical procedures were being performed in an emergency room was demonstrably reasonable. As the district court correctly ruled, this separation was necessary to maintain order in the hospital and to ensure that Taige's treatment was not interrupted, a distinct possibility caused by Mrs. Mueller's opposition to the procedures and her admittedly agitated state of mind. Eric Mueller describes his wife at this moment as "hysterically crying." This separation occurred not in a public place, but in a high-pressure location involving seriously ill and injured patients and delicate medical procedures. Persons who go to an emergency room are entitled by federal law to privacy, Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (1996), and not to be bothered or endangered by others while they are there. We find unpersuasive the Muellers' argument that Corissa should not have been taken temporarily to the privacy of a small room while doctors performed their duties. No clearly established law prohibited such action. *See Trevino*, 99 F.3d at 916-17. The district court's ruling was correct. Thus, we conclude that the officers are entitled to qualified immunity with regard to Corissa's Fourth Amendment claim.

## II

### Dr. Rosen's Testimony

**[9]** The Muellers take issue with the district court's decision pursuant to Federal Rule of Evidence 702 to admit the

testimony of Dr. Peter Rosen on behalf of Dr. Macdonald. Federal Rule of Evidence 702 requires that expert testimony be "the product of reliable principles and methods." Fed. R. Civ. P. 702(c). The Muellers argue that Dr. Rosen's opinion was based solely on "clinical instinct," which they argue is not a reliable basis for expert testimony under Rule 702. We review the district court's admission of expert testimony for abuse of discretion. *United States v. Cordoba*, 104 F.3d 225, 229 (9th Cir. 1997).

The Muellers concede that Dr. Rosen is well-credentialed in this field of medicine, and that he has had a distinguished career and extensive experience. About this, there can be no dispute. Dr. Rosen is a board-certified emergency room physician with over forty years of practice. In addition to being a prolific author, he was then a professor of emergency medicine at Harvard Medical School and the University of Arizona School of Medicine.

The essence of Dr. Rosen's opinion was as follows:

> What was, was the presentation of the child who looked ill, acted ill, and had a history of not behaving normally. She was lethargic. She was not feeding properly, and she did not have a normal initial physical examination. It was that constellation of presentation, history, and findings as to what convinced me that she was a patient who needed a mandatory fever workup and that the risk of a serious bacterial infection that Dr. Macdonald cited was very accurate.

Dr. Rosen also believed on the basis of the medical records that Taige probably did arrive at the hospital with a serious infection and that Dr. Macdonald's prompt administration of fluids and antibiotics "prevented her from developing a serious sepsis syndrome [including meningitis] from which she could not have recovered, causing her to die or leaving her permanently damaged." He credited Dr. Macdonald with act-

ing appropriately under the circumstances, and offered his opinion that Dr. Macdonald's risk assessment regarding Taige was valid. Here, he explained the role and value of an experienced doctor's "clinical instinct," upon which an emergency medicine "must often rely."

> In medicine, when we see a patient and when we're trying to figure out what's wrong with them, we sort of make a list in our head of what could be wrong, what could be causing the problem, what do I have to evaluate for and what do I have to treat.

> Emergency physicians take a little bit different approach than other physicians, because other physicians have time to sort of sit back and think about things and look things up and compare things. We have to make decisions very quickly, and we have to make lots of decisions all at once, all at the same time with very little information.

> So we make a differential diagnosis or a list of possibilities in our head. And we put—at the top of that list we put the worst thing it could be. What is the thing that could kill the person? What is the thing that could damage the person? What do I have to treat now and not miss? And then sort of work down the list to more likely things, but less concerning things.

[10] Contrary to the presentation of the Appellants' counsel at oral argument, clinical instinct is a well-recognized and accepted aspect of current medical practice. The precept encompasses what experience adds to scientific knowledge and training. Clinical instinct as a diagnostic and treatment tool is not new.

The district court made its decision to admit Dr. Rosen's testimony and opinions after careful, painstaking, and

thoughtful consideration. This decision was legally sound and an appropriate exercise of discretion. As the court correctly summarized the situation, Dr. Macdonald's diagnosis that Taige had a serious bacterial infection was "a judgment call based on clinical instinct and made under time pressure."

The district court reconsidered the admissibility of Dr. Rosen's testimony in the Muellers' post-trial motion for a new trial. As part of that thorough process, Dr. Rosen was recalled as a witness by video, and his trial testimony was again examined in the light of the Muellers' specific objection to it. As a result of this process, the court was again satisfied that Dr. Rosen's expert witness testimony was directly relevant to the central disputed issue of whether Dr. Macdonald "falsely exaggerated the risk to Taige Mueller in order to deprive the Muellers of their parental rights."

In the end, the court relied on our opinion in *Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010), in deciding that Dr. Rosen's testimony was relevant and admissible under Rule 702. In that case, we said:

> "Despite the importance of evidence based medicine, much of medical decision-making relies on judgment —a process that is difficult to quantify or even to assess qualitatively. Especially when a relevant experience base is unavailable, physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties" to "mak[e] a sound judgment."

*Id.* at 565 (alteration in original) (quoting *Harrison's Principles of Internal Medicine* 3 (Dennis L. Kasperet et al. eds., 16th ed. 2005)).

**[11]** In summary, the district court did not err or abuse its discretion in admitting the proffered testimony of Dr. Peter Rosen pursuant to Federal Rule of Evidence 702 or in denying

the Muellers' motion on this issue for a new trial. Dr. Rosen's testimony plainly assisted the jury in understanding the evidence and in determining the validity of Dr. Macdonald's risk assessment. Also, Dr. Rosen's opinion testimony was relevant with respect not only to the substantive issues before the jury, but also as direct rebuttal to the Muellers' expert, Dr. Eugene Shapiro. Once admissible, the weight to be given to Dr. Rosen's testimony was for the jury to determine. *Primiano*, 598 F.3d at 565.

## III

### The Dismissal of the Case Against St. Luke's

The district court did not err in dismissing the Muellers' § 1983 claims against St. Luke's without leave to amend, because it was clear that amendment would be futile. "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (internal quotation marks omitted).

**[12]** On de novo review, we conclude that the district court correctly granted St. Luke's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss without leave to amend. *See id.* St. Luke's did not become a state actor simply because it complied with state law requiring its personnel to report possible child neglect to Child Protective Services. State law does not amount to an actionable hospital policy. *See Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838 (9th Cir. 1999); *see also Brown v. Newberger*, 291 F.3d 89, 93 (1st Cir. 2002) (concluding that a doctor did not become a state actor by filing a report of suspected child abuse as required by state law). Moreover, St. Luke's medical standard of care under these circumstances isn't a policy either. Neither did social worker Bob Condon's testimony establish any actionable policy on the part of St. Luke's. In fact, the record conclusively

demonstrates that no appropriate amendment to the complaint could overcome these obvious problems. *See Manzarek*, 519 F.3d at 1034. The hospital's conduct in question was not fairly attributable to the State.

## IV

### A

### Section 1983 Conspiracy

[13] All viable claims against Dr. Macdonald went for determination to the jury, including the Muellers' claim that he was liable to them pursuant to 42 U.S.C. § 1983. Contrary to the Muellers' assertions, the substantive claims against Dr. Macdonald were not dismissed by way of summary judgment. As the district court correctly observed, the Muellers' case depended in large part upon proving as a major premise that "Dr. Macdonald falsely exaggerated the risk to Taige Mueller in an effort to use Detective Rogers' [sic] statutory authority to deprive the Muellers of their parental rights." The jury rejected this theory in its answer to a question put to it in a special verdict. To the question, "Did Dr. Macdonald make a false report of child neglect regarding Taige Mueller knowing that said report was false?", the jury answered "No." Instruction 15, about which the Muellers now complain, was not plain error. *See Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1230 (9th Cir. 2011).

### B

### Battery

The district court dismissed the Muellers' battery claim against Dr. Macdonald pursuant to Federal Rule of Civil Procedure 50(a). The record conclusively establishes that he did not treat Taige until he was given consent to do so by April Auker on behalf of the Idaho Department of Welfare. *Mueller*

*v. Auker*, 576 F.3d at 984-86. At the time, the State had taken legal custody of the Muellers' daughter. *Id.*

*Neal v. Neal*, 125 Idaho 617, 622; 873 P.2d 871, 876 (1994), states that "[c]ivil battery consists of an intentional, unpermitted contact upon the person of another which is either unlawful, harmful or offensive." *Id.* The Supreme Court of Idaho also held that "lack of consent is . . . an essential element of battery," and that "[c]onsent obtained by fraud or misrepresentation vitiates the consent and can render the offending party liable for a battery." *Id.*

**[14]** Auker's consent to treatment was valid unless obtained by fraud or misrepresentation. Although we ordinarily view the evidence on this issue in the light most favorable to the non-moving party, *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205-06 (9th Cir. 2008), the issue of possible fraud or misrepresentation on the part of Dr. Macdonald leading to April Auker's consent has now been resolved by dispositive events. As previously discussed in Part IV.A of this opinion, the issue of whether or not Dr. Macdonald knowingly made a false report to Detective Rogers of imminent danger to Taige in order to deprive the Muellers of their parental rights was litigated and did go to the jury. In a special verdict, the jury rejected the Muellers' theory. This finding of fact is fully supported by the record and conclusively determines between these parties in favor of Dr. Macdonald the factual issue of the validity of the State's consent to treat Taige upon which he relied. The jury's verdict is entitled to preclusive effect pursuant to the doctrine of collateral estoppel. Therefore, this issue is moot because it has become merely academic and thus no longer justiciable.

# V

## The Jury Instructions

**[15]** We review de novo jury instructions challenged as a misstatement of the law, and the formulation of jury instruc-

tions for abuse of discretion. *Gilbrook v. City of Westminster*, 177 F.3d 839, 860 (9th Cir. 1999). "Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th Cir. 2000). The jury instructions and the district court's rulings in relation to them, examined in the light of the issues and viewed as a whole, were complete, clear, correct, and adequate to allow the Muellers to pursue all their theories of liability.

First, the Muellers argue that the court was required to direct the jury that there is a presumption that the parents acted reasonably. They are mistaken because the Muellers' reasonableness is irrelevant to the question put to the jury: whether Taige was in imminent danger. *See Wallis*, 202 F.3d at 1138.

Next, the Muellers contend that the jury instructions erroneously put the burden on them to show an absence of imminent danger. However, in a claim brought under 42 U.S.C. § 1983 "the plaintiff carries the ultimate burden of establishing each element of his or her claim." *Pavao v. Pagay*, 307 F.3d 915, 919 (9th Cir. 2002). Because the Muellers' claims arise under section 1983 the jury instructions properly placed the burden on the Muellers.

Next, the Muellers argue that the jury instructions erroneously failed to mention the officers' duty to conduct a reasonable investigation. If there was any error here, it was harmless. The jury instructions mentioned most of the issues the Muellers contend should have been investigated. They argue the officers should have investigated the risks of treatment, how long it takes to obtain a warrant, and whether Mr. Mueller would have consented. All but the last of these were already included in the instructions as factors for the jury to consider. As to the remaining factor, our prior opinion in this case ruled that the officers were not liable for failing to contact Mr. Mueller. *Mueller*, 576 F.3d at 995-97.

Next the Muellers argue that the jury instructions incorrectly listed as an optional factor—rather than a required element—whether there was time to obtain a warrant. While our cases have discussed whether there is time to hold a hearing and obtain a warrant, *see, e.g.*, *Rogers*, 487 F.3d at 1294, this factor has never supplanted the central question, which is whether the child is in "imminent danger."

## VI

## Motion for New Trial

We review the denial of a motion for new trial for abuse of discretion. *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010). "A district court may grant a new trial only if the jury verdict is contrary to the clear weight of the evidence." *Id.* "The district court's denial of a motion for a new trial is reversible only if the record contains no evidence in support of the verdict or if the district court made a mistake of law." *Id.* (internal quotation marks omitted).

[16] The Muellers' claim that the district court erroneously denied their motion for a new trial is unsupported by the record. The Muellers argue that the jury implicitly found that Dr. Macdonald's conduct could not be attributed to St. Luke's and argue that this implicit finding is against the weight of the evidence, which, they argue, establishes that he was an apparent agent of St. Luke's. The jury's failure to find that Dr. Macdonald was an "apparent agent" of St. Luke's was not against the weight of evidence. *See id.* The evidence was such as to permit a reasonable factfinder to decide as this jury did. Although the Muellers argue that the district court abused its discretion "because the law requires some notice that the specific doctor in question . . . was an independent contractor," Idaho has not expressly adopted such a rule. *See Jones v. HealthSouth Treasure Valley Hosp.*, 147 Idaho 109, 116, 206 P.3d 473, 480 (2009). And, as we have already discussed, the court did not err in allowing the jury to hear Dr. Rosen's testi-

mony. Thus, we conclude that the district court did not abuse its discretion in denying the Muellers' motion for a new trial. *See DSPT Int'l, Inc.*, 624 F.3d at 1218.

## VII

## Failure to Train

We review de novo the district court's judgment as a matter of law in favor of the City of Boise with regard to the Muellers' claim of failure properly to train its officers. *Torres*, 548 F.3d at 1205.

[17] The court properly granted judgment as a matter of law against the Muellers' failure to train claim. To establish this claim, the Muellers had to "present[ ] . . . evidence of prior incidents" of the same character that would have made City officials "aware of the situation such that the [City] could reasonably be said to have been deliberately indifferent to the need for further training." *Merrit v. Cnty. of Los Angeles*, 875 F.2d 765, 771 n.10 (9th Cir. 1989) (internal quotation marks and alteration omitted).

The Muellers presented four "prior incidents" to support their claim. These incidents were insufficient to put the City on notice such that it could reasonably be said to have been deliberately indifferent to the need for further training. The Muellers rely exclusively on reports and affidavits prepared by officers, rather than complaints by the parents or other evidence that may have flagged these training problems for the City. *See City of Canton v. Harris*, 489 U.S. 378, 398-99 (1989). Without ruling on the merits of these incidents, these reports show officers taking measured steps to respond to life-or-death threats to infants. Nothing in these reports would have alerted a reviewing supervisor that the officers' training was so inadequate that the City can be said to have been deliberately indifferent to the need for training.

# VIII

## The Protective Order

We "review the grant or denial of a motion to quash a subpoena for abuse of discretion." *In re Cal. Pub. Util. Comm'n*, 892 F.2d 778, 780 (9th Cir. 1989). "Such abuses must be unusual and exceptional; we will not merely substitute our judgment for that of the trial judge." *Premium Serv. Corp. v. Sperry & Hutchinson Co.*, 511 F.2d 225, 229 (9th Cir. 1975).

[18] The district court's handling of the court's protective order granted to the Ada County Prosecutor's Office was not defective. The prosecutor's complete file was turned over to and examined by the court. The court in camera concluded that the prosecutor's file did not contain anything of significance, a point conceded during oral argument; and no adequate showing of relevance has yet been offered by the Muellers. They made no effort to subpoena or to depose the persons who were no longer in the prosecutor's office who were responsible for the material in the file, and they made no effort to include the file under seal in the record. Given this record, we cannot conclude that the district court abused its discretion in granting the protective order to the Ada County Prosecutor's Office. *See In re Cal. Pub. Util. Comm'n*, 892 F.2d at 780. Furthermore, the Muellers have not made the requisite showing that they were prejudiced by the district court's handling of the protective order. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 886 (9th Cir. 2002).

# IX

## Class Certification

We "review a district court's order denying class certification for an abuse of discretion." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939 (9th Cir. 2009).

**[19]**  The Muellers argue that "class certification is particularly appropriate when membership will be determined in the future, and the challenge is to a continuing policy." The fatal defect in this argument is that the Muellers have not identified either a generic policy or a refusal to act on the part of any of the defendants that would be subject to the broad equitable relief they seek. *See* Fed. R. Civ. P. 23(b). Moreover, their request for class certification presents itself as an attempt to represent persons not yet involved in a case or controversy, and it lacks any showing of commonality, typicality, or adequacy of representation. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ___, 131 S. Ct. 2541, 2551-57 (2011). "[T]o the extent that [the Muellers] seek[ ] to represent a class of parents who might in the future have their children removed, [they] lack[ ] standing." *Caldwell*, 928 F.2d at 335. The broad relief sought by the Muellers is properly addressed as a matter of policy to the legislature, not the courts. Thus, we conclude that the district court's decision to deny the Muellers class certification was correct.

## CONCLUSION

As best, this case involves a series of nighttime emergency room judgments and decisions made under pressure about which people might differ. At the end of the day, however, a jury of their peers decided on the basis of a full and fair airing of their evidence that the Muellers had not proved their case.

Doctors nowadays—especially in emergency rooms—and police officers face daunting challenges, one of which is state law requiring them to report to state authorities possible child abuse, endangerment, or neglect. Their failure to do so lands them in serious trouble. Also, a doctor's failure to recognize possible meningitis is equally problematic—as we discover from the testimony of Dr. Shapiro, the Muellers' expert witness.

Society has seen fit to qualify parental rights in certain circumstances in favor of the life and liberty rights of a child.

When the statutory due process used to actualize a child's right as recognized by state law comes into play, understandably parents will be upset. This case illustrates the validity of Justice Rehnquist's observation in *Santosky v. Kramer*, 455 U.S. 745, 771 (1982) (Rehnquist, J. dissenting), that "[s]tate intervention in domestic relations has always been an unhappy but necessary feature of life in our organized society." If anything, the completed record shows that Dr. Macdonald exercised his best judgment in an emergency setting in favor of ensuring an infant's safety from the very peril that caused her mother to take her in the middle of the night to a hospital emergency room. This is hardly the stuff of which a cognizable civil rights violation can be made.

**AFFIRMED.**